**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SHAWN MCLOUGHLIN, ROBERT MILLER, ANGELO ~~SOFOCLEUS~~SOFOCLEOUS, ANDREW LEWIS, CHEYNE BUNNETT, TOM ROBERTSHAW, and OLIVIA SCOTT (as the personal representative of the ESTATE OF RUSSELL SCOTT), | ~~Civ~~C.A. No. ~~1:~~23-~~cv~~-256-CFC |
| Plaintiffs, | |
| v. | |
| CANTOR FITZGERALD, L.P., BGC HOLDINGS, L.P., and NEWMARK HOLDINGS, L.P. | |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Shawn Mcloughlin, Robert Miller, Angelo ~~Sofocleus~~Sofocleous, Andrew Lewis, Cheyne Bunnett, Tom Robertshaw, and Olivia Scott (as the personal representative of the estate of Russell Scott), individually and on behalf of all others similarly situated, bring this action against Cantor Fitzgerald, L.P. ("CFLP"), BGC Holdings, L.P. ("BGC"), and Newmark Holdings, L.P. ("Newmark," collectively "Defendants") and allege as follows:

## I.    INTRODUCTION

1.      This case concerns a nearly fifteen year-long scheme to strip Plaintiffs and hundreds of other Defendants' employees of millions of dollars that are owed in connection with their employment. Plaintiffs and putative class members are all former limited partners of Defendants. Each of them worked at various offices across the globe until they either voluntarily left or were terminated from their employment. They all bought or were granted partnership interests in Defendants in connection with their employment.

2.      Defendants CFLP, BGC, and Newmark each provide a wide range of financial services and collectively employ more than 12,000 people across the globe. These entities comprise the largest of a related group of "Affiliated Entities" that are all effectively controlled by Howard Lutnick, Cantor Fitzgerald's CEO and Chairman.

Formatted: Left

2

3.      At the core of this case is the 2008 CFLP Partnership Agreement, the 2017 BGC partnership agreement, and the 2017 Newmark Partnership Agreement (collectively, the "Partnership Agreements"). The Partnership Agreements contain several interlocking provisions designed to restrict former limited partners from competing, soliciting clients or employees, or using any of the Defendants' confidential information for *four years* after a limited partner leaves.

4.      The Partnership Agreements are nearly identical in the form and manner in which they discourage competition by former limited partners. *First*, each of the Partnership Agreements contains restrictive covenants that prohibit partners from engaging in competitive activities for up to two years (the "~~Non-Compete Provisions").~~Restrictive Covenant Device"). During this period, Defendants can respond to a purported violation of the ~~Non-Compete Provisions~~Restrictive Covenant Device by seeking injunctive relief and damages.

5.      *Second*, each of the Partnership Agreements contains provisions that discourage competition by allowing Defendants to withhold payments otherwise owed to a terminated partner (the "~~Forfeiture-for-Competition Provisions" or "FCPs"). Each of the FCPs~~Conditioned Payment Device"). Under each Partnership Agreement, the Conditioned Payment Device operates for four years, and provides that Defendants are to pay a departing limited partner one fourth of the payments owed each year, unless the partner engages in certain competitive activities.

**Formatted:** Left

6.      Under the terms of their partnership agreements, either the Managing General Partner (for CFLP) or the General Partner (for BGC and Newmark) controls the decision on whether a former limited partner breaches the ~~Non-Compete Provisions~~Restrictive Covenant Device or the ~~FCPs~~Conditioned Payment Device. In both form and substance, the Partnership Agreements and the interrelated entities that are parties to the agreements allow Howard Lutnick the sole authority to decide when to deny a former partner the compensation they've earned in connection with their employment.

7.      Lutnick has used his effective control across each of these entities to effectuate a scheme designed to enrich himself at the cost of employees who are duped into believing they've earned significant compensation while contributing their efforts and labor to the growth of Defendants' enterprise.

8.      The scope of Lutnick's authority to deny payment to former limited partners under the Partnership Agreements is astounding. Both the ~~Non-Compete Provisions~~Restrictive Covenant Device and the ~~FCPs~~Conditioned Payment Device are worldwide in their geographic scope. They protect not just Defendants, but also all "Affiliated Entities." They prevent former employees from soliciting not just Defendants' limited partners and employees, but they also trigger if one of Defendants' consultants is solicited. Indeed, Defendants interpret the scope so

**Formatted:** Left

4

broadly that they cannot provide departing limited partners with any guidance whatsoever as to what sort of conduct these provisions *do not* implicate.

9.      Earlier this year, the Delaware Chancery Court found both the ~~restrictive provisions~~Restrictive Covenant Device and the Conditioned Payment Device in CFLP's partnership agreement unenforceable as a matter of Delaware law. In finding that "no compelling interest could justify the breadth of this forfeiture," the Court painted a hypothetical to illustrate its incredible scope:

> A former Cantor Fitzgerald partner who worked as a broker in the Hong Kong office could withdraw from the Partnership, move to Europe, and switch professions by taking a position as an accountant for a large international accounting firm. If that accounting firm provides services for a European-based entity in the "institutional brokerage business," and the Managing General Partner determines that such accounting work "could be considered to be" "assist[ing] others in engaging in" indirectly competing with a Cantor Fitzgerald affiliate, then Cantor Fitzgerald could seek injunctive relief and withhold payment of all Conditioned Amounts.

10.      Since this opinion became public, many former limited partners came to learn that Defendants – led by Lutnick – have ~~exercised~~leveraged the ~~FCPs at issue~~Conditioned Payment Device contained in each ~~of these agreements~~Partnership Agreement in bad faith. Indeed, Defendants have used the ~~FCPs~~Conditioned Payment Device to deny payments to: (1) those who have agreed to sit out for a period of time before returning to the workforce; (2) those who are told – at the time they are leaving – that they are "good leavers" and will receive their partnership

**Formatted:** Left

payments notwithstanding their subsequent employment; and (3) a widow of a former partner who passed away shortly after leaving Defendants' employment.

11.    The incredulous exercise of the ~~FCPs~~Conditioned Payment Device to deny former limited partners their earned compensation without any justifiable reason demonstrates the true purpose of these provisions: they operate to effectuate a scheme by those in control of the Defendant partnerships to enrich themselves at the expense of their former employees.

12.    ~~Defendants' enforcement of the Non-Compete Provisions~~Shortly after this action was filed, BGC amended its Partnership Agreement and ~~FCPs is fundamentally altered~~ both ~~a breach of~~ the Restrictive Covenant Device and the Conditioned Payment Device by drastically reducing the scope and duration of both devices. On information and belief, both CFLP and Newmark made near identical changes to their ~~respective partnership agreements and unlawful~~Partnership Agreements.

~~12.~~13.Defendants' historic use of the Restrictive Covenant Device and the Conditioned Payment Device is not only unreasonable and thus unenforceable under Delaware law, it is also a violation of Section 1 of the Sherman Act. Plaintiffs bring this action to recover their damages, trebled, as well as injunctive and other appropriate relief on behalf of all others similarly situated.

## II.    PARTIES

**Formatted:** Left

**a. Plaintiffs**

13.14. Plaintiff Shawn Mcloughlin, a former limited partner of BGC, is a United States citizen currently residing in Florida. Mcloughlin was employed as the CEO of BGC Financial – Americas Region since September 2017 until he was terminated in May 2020. He joined BGC in 2012.

14.15. Plaintiff Robert Miller, a former limited partner of BGC and Newmark, is a United States citizen currently residing in Florida. Miller served as the Head of US Credit Products at BGC from 2016 until he was terminated in December 2019. He first joined BGC in 2009.

15.16. Plaintiff Angelo Sofocleus Sofocleous, a former limited partner of CFLP, is a resident and citizen of the United Kingdom. Sofocleus Sofocleous joined CFLP in 2012, and from 2016 through 2020 served as the CEO of Cantor Fitzgerald Europe.

16.17. Plaintiff Andrew Lewis, a former limited partner of CFLP, is a resident and citizen of the United Kingdom. Lewis joined CFLP in 2012, and from 2015 through 2020 served as the Head of UK Market Making at Cantor Fitzgerald Europe.

17.18. Plaintiff Cheyne Bunnett, a former limited partner of CFLP, is a resident and citizen of the United Kingdom. From 2012 through 2020, Bunnett was an Investment Companies Equity Market Maker at Cantor Fitzgerald.

**Formatted:** Left

~~18.~~19.Plaintiff Tom Robertshaw, a former limited partner of CFLP, is a resident of the United Kingdom. From 2012 through 2020, Robertshaw was an Equity Market Maker at Cantor Fitzgerald.

~~19.~~20.Plaintiff Olivia Scott is the personal representative of Russell Scott. She is a resident and citizen of the United Kingdom. Russell Scott was a former limited partner of CFLP. Russell Scott joined CFLP in 2015 and left CFLP in 2019. Shortly after he left CFLP, he passed away.

**b. Defendants**

~~20.~~21.Defendant CFLP is a Delaware limited partnership with its principal place of business in New York, New York. CFLP is an American financial services firm that specializes in institutional equity, fixed income sales and trading, and serving the middle market with investment banking services. Lutnick is the Chairman and CEO of CFLP.

~~21.~~22.Defendant BGC is a Delaware limited partnership with its principal place of business in New York, New York. BGC is a leading global brokerage company that specializes in inter-dealer brokering. Lutnick is the Chairman and CEO of BGC. Originally formed as part of the larger Cantor Fitzgerald organization, BGC became its own entity in 2004.

~~22.~~23.Defendant Newmark is a Delaware limited partnership with its principal place of business in New York, New York. Newmark is a commercial real

**Formatted:** Left

8

estate advisory and services firm. Lutnick is the Chairman of Newmark and Barry Gosin is its CEO. BGC acquired Newmark in 2011.

### III.   JURISDICTION AND VENUE

23.24. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.

24.25. Venue is proper in this district under 15 U.S.C. § 22 and under 28 U.S.C. §§ 1391 because Defendants are each Delaware limited partnerships.

25.26. Personal jurisdiction is proper in this Court because Defendants are each Delaware limited partnerships.

### IV.   FACTUAL ALLEGATIONS

#### a. The Partnership Agreements

##### i.   Types of Partnership Units

26.27. Each of the Defendants issues limited partnership interests that are governed by the Partnership Agreements for the various entities.. Each of the Partnership Agreements contemplates a numbervariety of different partnership interests and the types of partnership units that are granted to limited partners varies slightly between each of the three agreements. Generally, however, each of the

**Formatted:** Left

9

Partnership Agreements contemplates at least two different types of partnership units which are relevant to this dispute.

27.    The first type of partnership units are "Grant Units."[1] These units are issued to Plaintiffs — in connection with their employment — at Defendants' discretion. Typically, Defendants give out Grant Units (or Working Partner Units), as a percentage of each employee's bonus each year.

28.    The second type of partnership units are "High Distribution Units" or "HD Units." Unlike Grant Units, HD Units are purchased by Defendants' employees. Oftentimes employees take out loans to purchase these units. Employees are obligated to repay these loans regardless of whether they remain employed or are terminated.

ii.   The Non-Compete Provisions

28.    With respect to the CFLP Partnership Agreement, each partner's capital account reflects his or her capital contributions, including contributions for purchasing High Distribution Units ("HDII Units").

29.    Under Section 11 of the CFLP Partnership Agreement, within ninety days of termination, a withdrawing partner is entitled to an initial payment consisting of a portion of her capital account, referred to as the "Base Amount." The remaining

---

[1] The BGC and Newmark Partnership Agreements refer to these kind of units as Working Partner Units. Working Partner Units cover a broad scope of different kinds of ownership units including PSU and PPSU Units.

**Formatted:** Left

10

amounts owed for the partner's HDII Units (the "Additional Amounts") are paid out "on each of the first, second, third and fourth anniversaries" of the Base Amount payment date.

30.    In addition to purchasing HDII Units, CFLP partners can earn Partnership units referred to as "Grant Units" and "Matching Grant Units" as a form of compensation. Sections 11.08, 11.09, and 11.10 of CFLP Partnership Agreement govern post-termination payments to Grant Unitholders, Matching Grant Unitholders, and grant tax accounts (the "Grant Amounts"). Like the H2II Units, the agreement provides for payment of Grant Amounts in four equal installments over four years.

31.    Article XII of both the BGC and Newmark Partnership Agreements govern the payment of (1) "Working Partner Units" which include partnership units such as "PSUs" and "PSEs", (2) "Non-Participating Units" such as NPSUs; and (3) "Grant Tax Payment Accounts."

32.    Like the CFLP Partnership Agreement, the BGC and Newmark Partnership Agreements provide for similar installment like payments to terminated partners for their Working Partner Units, Non-Participating Units, and Grant Tax Payment Accounts. These partnership interests are to be paid out to terminated partners over four years in four equal installments.

Formatted: Left

33.    Each of the partnership units described above (collectively, the "Conditioned Amounts") are subject to restrictions that allow the Managing Partner for each partnership to deny these payments pursuant to the conditions described below in Part IV(a)(iii).

ii.   The Restrictive Covenant Device

29.34. Each of the Partnership Agreements contain *nearly identical* non-compete provisions (the "Non-Compete Provisions"). Each of the Non-Compete Provisions Restrictive Covenant Device").[2] The Restrictive Covenant Device imposes certain "Partner Obligations" on current and former partners of Defendants. Pursuant to those "Partner Obligations," a partner is *prohibited* from engaging in "Competitive Activity" within the "Restricted Period."

30.35. The term "Competitive Activity" is defined within each of the Partnership Agreements to include the following conduct:

(A) directly or indirectly, or by action in concert with others, solicits, induces, or influences, or attempts to solicit, induce or influence, any other partner, employee or consultant of any member of the Cantor Group, the BGC Partners Group or the Newmark Group or any other Affiliated Entity to terminate their employment or other business arrangements with any member of the Cantor Group, the BGC Partners Group or the Newmark Group or any other Affiliated Entity, or to engage in any Competing Business, or hires, employs, engages

---

[2] The Restrictive Covenant Device is contained within Section 3.05 of the CFLP of the Partnership Agreement and Section 3.03 of the BGC and Newmark Partnership Agreements.

**Formatted:** Left

(including as a consultant or partner) or otherwise enters into a Competing Business with any such Person,

(B) solicits any of the customers of any member of the Cantor Group, the BGC Partners Group or the Newmark Group or any other Affiliated Entity (or any of their employees or service providers), induces such customers or their employees or service providers to reduce their volume of business with, terminate their relationship with or otherwise adversely affect their relationship with any member of the Cantor Group, the BGC Partners Group or the Newmark Group or any other Affiliated Entity;

(C) does business with any person who was a customer of any member of the Cantor Group, the BGC Partners Group or the Newmark Group or any other Affiliated Entity during the twelve (12)-month period prior to such Partner becoming a Terminated or Bankrupt Partner if such business would constitute a Competing Business;

(D) directly or indirectly engages in, represents in any way, or is connected with, any Competing Business, directly competing with the business of any member of the Cantor Group, the BGC Partners Group or the Newmark Group or any other Affiliated Entity, whether such engagement shall be as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business; or

(E) assists others in engaging in any Competing Business in the manner described in the foregoing clause (D).

(*See* Ex. 1 at 101, BGC Partnership Agreement, available at

https://www.sec.gov/Archives/edgar/data/1690680/000119312517373644/d451435

dex103.htm; Ex. 2 at 92 Newmark Partnership Agreement, available at

Formatted: Left

13

(4) competes with any other business conducted by any member of the Cantor Group, the BGC Partners Group or the Newmark Group or any other Affiliated Entity if such business was first engaged in by any member of the Cantor Group, the BGC Partners Group or the Newmark Group or any other Affiliated Entity, or any member of the Cantor Group, the BGC Partners Group or the Newmark Group or any other Affiliated Entity took substantial steps in anticipation of commencing such business and prior to the date on which such Founding/Working Partner or REU Partner, as the case may be, ceases to be a Founding/Working Partner or REU Partner, as the case may be."

*Id.* at 93 (the other Partnership Agreements similarly define Competitive Activity to encompass competition with Cantor Group, BGC Partners, Newmark Group, or any other Affiliated Entity).

~~33.~~38. The Partnership Agreements define "Affiliated Entity" to mean "the limited and general partnerships, corporations or other entities owned, controlling, controlled by or under common control with the Partnership."

~~34.~~39. Together, the terms of the ~~Non-Compete Provisions~~Restrictive Covenant Device operate to restrict Plaintiffs and the class in an anticompetitive and unreasonable manner.

~~35.~~40. There is no geographic limitation on *any* of the restrictions.

41.    The determination of whether Plaintiffs or the class breach the ~~Partnership Agreements~~Restrictive Covenant Device is determined by either the Managing General Partner or the General Partner "in its sole and absolute discretion, which determination will be final and binding." *Id.* at 44.

15

Formatted: Left

36.42. This, in effect, means that Lutnick controls such determinations.

37.43. This authority expands the scope of prohibited employment from competing activities to employment that may not actually compete (and therefore not harm any legitimate interest of Defendants) so long as Lutnick believes in good faith that the activity fell within the scope of Competitive Activity.

38.44. The Non-Compete Provisions areRestrictive Covenant Device is most patently unreasonable in the scope of who they protect.it protects. The term "Competitive Activities" prohibits actions not just competing against Defendants, but also "any Affiliated Entity." Prohibited solicitation is not limited to successfully convincing a Defendant partner to withdraw to work for a competitor; it also includes acting in concert with others to attempt to "solicit, induce or influence" a consultant to terminate "other business arrangements" with Defendants, and inducing a customer or employee of a Defendant affiliate to "adversely affect their relationship" with an affiliate.

39.45. Other prohibited activities include assisting others in becoming "connected with any Competing Business" of an affiliate and taking "any action that results directly or indirectly in revenues or other benefits for that Limited Partner or any third party that is *or could be considered* to be engaged in such Competitive Activity."

**Formatted:** Left

16

40.46. Under these standards, ~~it is possible, and even likely, that~~numerous former ~~employees of Defendants could~~limited partners have unknowingly ~~engage~~engaged in ~~a~~Competitive ~~Activity~~Activities.

~~41.   Finally, in the context of these broad and vaguely defined provisions, the Non-Compete Provisions temporal scope is unreasonable.~~

~~iii.   Forfeiture-for-Competition Provisions (FCPs)~~

iii.  The Conditioned Payment Device

42.   As ~~explained~~described above, ~~the Non-Compete Provisions of the Partnership Agreements prohibit Plaintiffs and class members from engaging in "Competitive Activity" during the "Restricted Period."~~

43.47. ~~When~~ in Part IV(a)(i), when a partner withdraws or is terminated, Defendants redeem the former partner's ~~Grant Units and HDII Units, and make payments~~partnership units and pay out the Conditioned Amounts to ~~the~~ former partner in four ~~installment~~installments over the succeeding four years.

44.48. However, each of the Partnership Agreements ~~have provisions~~contain a "Conditioned Payment Device"[4] that allow Defendants to deny payment to former limited partners of the Conditioned Amounts if they engage in certain forms of competition.

_____

[4] The Conditioned Payment Device is contained within Article XI of the CFLP Partnership Agreement and Article XII of the BGC and Newmark Partnership Agreements.

17

45.    Each of these "FCPs" cause former employees who compete with Defendants to forgo any Grant Unit or HDII Unit-related payments.

46.49. The amounts partners forfeit because of the FCPs when the Managing Partner exercises the Conditioned Payment Device are not tethered to any quantification of potential harm to Defendants from competition. Rather, they are tethered to the limited partner's capital contributions and earned compensation. And the breadth of the Competitive Activity that the Partnership Agreements govern makes it possible, if not likely, that a former partner will engage in it accidentally or unknowingly.

47.50. Defendants present the terms of each Partnership Agreement on a take-it-or-leave-it basis as condition of joining one of the partnerships.

48.51. Additionally, the FCPs Conditioned Payment Device effectively restrain restrains former partners for at least two years longer than the Non-Compete Provisions Restrictive Covenant Device, as the term of the FCP Conditioned Payment Device survives up to four years after a partner leaves the partnership.

49.52. This is especially problematic when an employee is terminated or asked to leave. Under the terms of the Partnership Agreements, a terminated employee is faced with a choice: either get a new job and forfeit compensation you've previously earned or completely sit out of your chosen profession (and a plethora of other professions, for that matter, given the scope of Competitive Activity) for *four years*.

18

Formatted: Left

50.53. Defendants have no compelling interest to justify the breadth of the FCPs. Instead Conditioned Payment Device. Rather, these provisions are designed to allow Defendants and Lutnick to enrich themselves at the expense of those who are either terminated or who voluntarily leave the partnerships.

### b. The Separation Agreements

51.54. Sometimes, when a limited partner departs from one of the partnerships, Defendants will present them with a partnership separation agreement (the "Separation Agreements"). While these agreements sometimes alter the payment schedule contemplated for payments in connection with the Grant and HDII Units Conditioned Amounts, they nonetheless are designed to further effectuate and enforce the same anti-competitive scheme.

52.55. Indeed, like the Partnership Agreements, each of the Separation Agreements has an express clause prohibiting "solicitation" and "competition."

53.56. Like the FPCs, each Each of the Separation Agreements prohibit Competitive Activity in effectively the same manner as the Conditioned Payment Devices contained within the Partnership Agreements prohibit.

Formatted: Left

54.57. ~~Like the FPCs, the vast~~The majority of the Separation Agreements also contain four-year terms that prohibit solicitation and competition with Defendants and their Affiliates.[5]

55.58. Effectively, the Separation Agreements provide Defendants the same ~~flexibility~~mechanisms to deny paying compensation owed to Plaintiffs and class members. Many of those who sign the Separation Agreements do so under the guise and promise from Defendants that they will receive the compensation owed to them.

56.59. Defendants' intention, however, is to lure those who sign the Separation Agreements into a false sense of security that they will get paid the ~~compensation~~Conditioned Amounts that they are owed.

57.60. For many former partners, when payment under the Separation Agreements is demanded, Defendants either ignore the request or manufacture a pretextual reason for denying payment.

**c. ~~CFLP Has~~Defendants Have Refused to Pay Plaintiffs Their Partnership Interests**

58.61. Plaintiffs are all former limited partners and employees of Defendants. Each Plaintiff executed at least one of the Partnership Agreements in connection with their employment with Defendants.

---

[5] Sometimes the Separation Agreements reduce the four-year term for the Conditioned Payment Device to a three-year term.

**Formatted:** Left

59.62. Plaintiffs each received Grant Units, Working Partner Units, and HDII Units, Non-Participating Units, and Grant Tax Payment Accounts during the course of their employment with Defendants and in connection with their status as limited partners.

60.     Since Plaintiffs left Defendants' employment, Defendants have refused to pay Plaintiffs the full amounts they are owed.

63.     For Plaintiffs Lewis, Bunnett, Robertshaw, and Scott, each of them were owed "four equal payments" pursuant to Sections 11.04, 11.08, 11.09, 11.10 of the CFLP Partnership Agreement "within 90 days of each of the first, second, third, and fourth anniversaries" following their withdrawal.

64.     Each of Plaintiffs Lewis, Bunnett, Robertshaw, and Scott were denied the Conditioned Payments owed to them under these sections of the CFLP Partnership Agreement pursuant to the Conditioned Payment Device.

65.     For Plaintiff Sofocleous, he executed a Separation Agreement on April 16, 2020, that provided him payment for his Grant Units, Grant Tax Payment Account, and LPUs owed to him by CFLP in four installments that were payable over a three year period.

66.     Plaintiff Sofocleous was denied payments owed to him under Section 2 of the Separation Agreement pursuant to the Conditioned Payment Device contained in that agreement.

**Formatted:** Left

21

67. For Plaintiffs McLoughlin and Miller, each of them executed Separation Agreements on November 23, 2020, and March 9, 2021 respectively that provided them payment for their Working Partner Units, Non-Participating Units, and Grant Tax Payment Accounts in four installments. McLoughlin's payments were owed over a three-year period and Miller's payments were owed over a four-year period.

68. Both McLoughlin and Miller were denied payments owed to each of them under Section 2 of the Separation Agreement pursuant to the Conditioned Payment Device.

69. All conditions precedent to bringing this action for each Plaintiff under both the Partnership Agreements and the Separation Agreements have occurred or been waived or are unenforceable.

**d. Section 13.19(a) of the BGC and Newmark Partnership Agreements Either Does Not Apply to this Action or is an Unlawful Limitation**

70. After this action was filed, Defendants asserted that McLoughlin and Miller's claims are untimely because they were brought outside "the one-year limitations period that each of them agreed to in the BGC and Newmark Partnership Agreements." Dkt. 20 at 20.

71. The provision of the BGC and Newmark Partnership Agreements that Defendants rely on is Section 13.19(a), which states:

Formatted: Left

22

61.   Notwithstanding anything in this Agreement or in law or equity to the contrary, no Founding/Working Partner and no REU Partner may institute any action challenging, directly or indirectly, the terms, conditions or validity or any other matter related to or **arising out of any redemption by the Partnership of Units and/or Non-Participating Units held by such Partner**, whether such action is based (in whole or in part) in contract, tort and/or any duty otherwise existing in law or equity (a "Challenge") unless such Challenge is instituted on or prior to the first anniversary (the "Challenge Deadline") of the later of (i) the effective date of the challenged redemption (the "Effective Date") and (ii) the giving of notice by the Partnership with respect to such challenged redemption. If a Challenge is not instituted by such Partner on or prior to the Challenge Deadline, such Partner shall be thereafter foreclosed from instituting any Challenge. It shall be a condition to a Partner instituting any Challenge, that (i) such Partner shall have thus acquired Plaintiffs' limited partnership interests for no retained the consideration, while retaining amounts that Plaintiff paid to purchase those interests. such Partner in the challenged redemption (the "Redemption Consideration") in the same form as paid by the Partnership and free from any liens or other encumbrances and (ii) such Partner shall make a binding offer to return such Redemption Consideration to the Partnership on the Final Adjudication Date of any successful Challenge in the same form as paid by the Partnership and free from any liens or encumbrances.

72.   McLoughlin and Miller's partnership units were "redeemed for zero" in connection with their execution of the Separation Agreements dated November 23, 2020, and March 9, 2021 respectively.

23

73.     Therefore, Section 13.19(a) does not govern McLoughlin and Miller's claims because Mcloughlin and Miller's claims do not "arise out of" Defendants' "redemption" of their partnership units.

74.     Rather, McLoughlin and Miller's claims arise out of Defendants' nonpayment of the compensation owed to them pursuant to Section 2 of their Separation Agreements.

75.     In the alternative, if Defendants are correct, and Section 13.19(a) of the BGC and Newmark Partnership Agreements govern claims arising from the nonpayment of compensation owed under Section 2 of the Separation Agreements, then Section 13.19(a) is an unreasonable and unenforceable limitation under Delaware law because it would effectually abrogate the right for McLoughlin and Miller to bring claims under these agreements.

76.     That's because under the Separation Agreements, each of McLoughlin and Miller were entitled to payments that were not owed by Defendants until "ninety (90) days after the first [and second] anniversary" of their partnership units being "redeemed." McLoughlin was owed his final payments "(90) days after the **third** anniversary" of the redemption of his partnership shares. Miller was owed his final payments "(90) days after the **fourth** anniversary" of the redemption of his partnership shares."

Formatted: Left

24

77.    Defendants' assertion that Section 13.19(a) operates to bar McLoughlin and Miller's from bringing claims related to these payments necessarily means that McLoughlin and Miller *could never* bring their claims as the contractual modification of the statute of limitations on their claims would expire before their claims ever accrued.

78.    Defendants' position is therefore not only untenable; it is also further evidence of the scheme effectuated by Lutnick to enrich himself at the expense of former limited partners. If Defendants are correct, then Section 13.19(a) effectively prohibits former limited partners from ever bringing claims – as their rights to do so would expire before the payments owed were ever due.

79.    Such a restriction is unenforceable under Delaware law.

d.c.    **The Relevant Markets and Market Power**

62.80. Defendants participatecompete in two distinct labor markets in the United States relevant to this Complaint: (1) the Equity Capital Labor Market and (2) the Interdealer Broker ("IDB") Labor Market.

i.    Equity Capital Markets

81.    CFLP competes in the Equity Capital Markets ("ECM") industry. ECMDefendants' price fixing in these markets is *per se* anticompetitive, obviating any market definition, because the Restrictive Covenant Device and the Conditioned Payment Device govern post-employment conduct amongst potential competitors.

Formatted: Left

25

That is, these restraints not only foreclose an input (in the form of labor) to competitors of Defendants, but also current and future competition for the provision of services in these two markets directly from Plaintiffs and members of the class.

82.    Because plaintiffs and class members were experienced financial services professionals in either the Equity Capital Labor Market or the IBD Labor Market at the time they signed the Partnership Agreements with the Defendants, they were actual or potential competitors with Defendants when they agreed to be subject to the Restrictive Covenant Device and the Conditioned Payment Device.

83.    Because the Restrictive Covenant Device and the Conditioned Payment Device were imposed by agreements between competitors on the way they will compete with one another in the future, the post-employment application of these devices qualify as horizontal restraints.

84.    Professionals in the Equity Capital Labor Market and the IDB Labor Market compete with each other in a manner similar to how individuals in other professional services compete with each other.

85.    For example, a lawyer at a litigation-focused law firm can be either an employee or a partner at that law firm. That same lawyer can also be a competitor to her law firm because her special training and professional degree allow her to offer her services in competition to her law firm if she decides to leave. This same dynamic exists for professionals in the Equity Capital and IDB Labor Markets.

Formatted: Left

86.    As one example, prior to joining BGC as CEO of Americas Region, McLoughlin co-founded and was the CEO of Ticonderoga Securities LLC – a competitor to BGC that operated in the IDB Labor Market. Indeed, Ticonderoga Securities LLC was partially funded by ICAP – BGC's biggest competitor in the IDB Labor Market.

87.    McLoughlin is therefore a competitor to Defendants.

88.    The Partnership Agreements are naked horizontal restraints that have no purpose except stifling competition.

89.    Defendants' conduct is also illegal under any rule of reasons or "quick look" analysis that may apply. That's because the Restrictive Covenant Device and the Conditioned Payment Device have substantial anticompetitive effects in the labor market for both Equity Capital Market and the IBD Market.

i.  Equity Capital Labor Market

63.90. CFLP competes for labor in the Equity Capital Labor Market. The Equity Capital Market refers to the financial services that help companies raise equity capital. It consists of the primary market for private placements and initial public offerings. It also consists of the secondary market, where existing shares are sold, as well as futures, options, and other listed publicly listed securities.

64.91. Professionals in the ECM industry The Equity Capital Labor Market is comprised of financial services professionals who are often evaluated on their ability

**Formatted:** Left

27

to originate new business. ~~Professionals in ECM~~Financial professionals in the Equity Capital Labor Market often lead client engagement initiatives by preparing marketing pitches and follow trends in order to pitch prospective clients.

~~65.~~92. Given the importance of relationship management in ~~the ECM industry~~Equity Capital Markets, competitors in the ~~ECM industry~~Equity Capital Labor Market place significant value on professionals who have developed strong networks amongst other stakeholders such as investment banks, brokers, and hedge funds.

~~66.~~93. CFLP has market power in ~~the ECM industry.~~both the Equity Capital Market and the Equity Capital Labor Market. CFLP services 5,000 institutional clients globally. CFLP's website boasts that it serves a wide degree of clients, including "insurance companies, asset managers, investment advisors, hedge funds, as well as regional broker-dealers, small and mid-sized banks, specialist investment firms and REITs."

~~67.~~94. CFLP's website further boasts that "Cantor's Domestic Equities desk is one of the largest on Wall Street. Through our 125-strong equity capital markets team, we trade over $160 billion of securities each year on the NYSE and NASDAQ exchanges."

~~68.~~95. CFLP employs thousands of people in the United States who ~~service the ECM industry.~~compete in the Equity Capital Labor Market.

**Formatted:** Left

28

ii.   Interdealer Broker Labor Market

96.   An inter-dealer broker (IDB)BGC competes in the Interdealer Broker ("IDB") Labor Market.

69.97.An IDB is a specialized financial intermediary that facilitates transactions between investment banks, broker-dealers, and other large financial institutions. IDBs work with large blocks of securities where there is low trading volume or when clients seek anonymity on their orders.

70.98.ProfessionalsFinancial professionals in the IDB space often focus on trades where there is no formal exchange or market maker system. As such, IDBs operate in over-the-counter (OTC) markets, servicing municipal, government, corporate, and other bonds.

71.99.Because OTC markets are decentralized, liquidity and transparency are limited. Professionals in the IDB space take on a crucial role, providing pricing information, liquidity, and privacy for their trading actions. In a way, they are eachact as mini-exchanges where other financial institutions can find bids and offers for their activities.

72.100.   Inter-dealer brokersFinancial professionals in the interdealer broker market add value to financial institutioninstitutional traders in several ways. IDBsThey work to improve price discovery and transparency by posting a bid, offerbids, offers, and sizesizes of available securities for trading. This listing assists

**Formatted:** Left

29

with the flow of information and provides market liquidity and efficiency in a space where there are not many players.

73.101.    BGC has market power in the IDB market. In 2020, BGC generated more than $2 billion in revenue and had a 34% market share:

| IDB | 2016 | 2017 | 2018 | 2019 | 2020 | Market Share % | Change |
|-----|------|------|------|------|------|----------------|--------|
| | | | | TOTAL IDB REVENUE | | | |
| BGC Partners | 1,554 | 1,751 | 1,938 | 2,104 | 2,057 | 34% | 32% |
| Marex Spectron | 330 | 322 | 389 | 555 | 762 | 6.8% | 131% |
| TP ICAP | 2,352 | 2,449 | 2,458 | 2,555 | 2,501 | 43% | 6% |
| Tradition | 950 | 876 | 966 | 1,009 | 986 | 17% | 4% |
| TOTALS | 5,187 | 5,399 | 5,750 | 6,223 | 6,306 | 100% | 22% |

102.    This market share in the IDB product market demonstrates that BGC has market power in the IDB Labor Market.

74.103.    BGC's website boasts that its customers "include many of the world's largest banks, broker-dealers, investment banks, trading firms, hedge funds, governments, corporations, and investment firms."

75.104.    BGC employs over 2,000 people globally, including more than 500 people in the United States.

iii.    Geographic Market

76.105.    The United States is the relevant geographic market for both the markets regarding Defendants' conduct are the nationwide Equity Capital Labor Market and the Interdealer Brokernationwide IDB Labor Market.

Formatted: Left

77.106.      Both BGC and CFLP treat the United States as a ~~separate~~distinct geographic market. Both BGC and CFLP maintain ~~separate~~distinct divisions for the United States market. ~~Professionals~~Financial services professionals for both BGC and CFLP in the United States divisions will only deal with assets that are available in the United States pursuant to U.S. regulations.

107.   ~~The Non-Compete Provisions and the FCPs~~CFLP operates its Equity Capital Market services throughout its twenty-eight offices across the United States. BGC operates its IDB services throughout its eight offices across the United States.

108.   The Partnership Agreements further evidence that CFLP and BGC compete in a national labor market. The terms Competitive Activity and Competing Business have no geographic constraint. That Defendants themselves assert that the competitive restrictions at issue are nationwide is direct evidence that they believe both the Equity Capital and IDB Labor Markets are nationwide.

109.   Even Lutnick has asserted that the market that CFLP operates in is at least national in scope. In fact, he has repeatedly leveraged the Restrictive Covenant and Conditioned Payment Devices to deter competition from limited partners employed by CFLP in cities across the world – like London and Hong Kong – who choose to move to cities like New York to work in Equity Capital Markets.

110.   Finally, further evidencing a nationwide market, both CFLP and BGC: (i) advertise their services nationwide; (ii) operate nationwide; (iii) have customers

31

nationwide; (iv) provide the same services nationwide; and (v) impose the same exact competitive restrictions on their limited partners nationwide.

e.f. **The Restrictive Covenant Device and the Conditioned Payment Device Harm Competition**

Formatted: Keep with next

  i. Anticompetitive Effects of Non-Competes Generally

78.111. True to their name, non-compete agreements limit competition in design and effect.

79.112. Labor markets function by matching workers and employers. Workers offer their skills and time to employers. In return, employers offer pay, benefits, and job satisfaction. In a well-functioning labor market, a worker who is seeking a better job—more pay, better hours, better working conditions, more enjoyable work, or whatever the worker may be seeking—can enter the labor market by looking for work.

80.113. Employers who have positions available compete for the worker's services. The worker's current employer may also compete with these prospective employers by seeking to retain the worker—for example, by offering to raise the worker's pay or promote the worker. Ultimately, the worker chooses the job that best meets their objectives. In general, the more jobs available—i.e., the more options the worker has—the stronger the match the worker will find.

81.114. Just as employers compete for workers in a well-functioning labor market, workers compete for jobs. An employer who needs a worker will make

Formatted: Left

it known that the employer has a position available. Workers who learn of the opening will apply for the job. From among the workers who apply, the employer will choose the worker that best meets the employer's needs—in general, the worker most likely to be the most productive. In general, the more workers who are available—*i.e.*, the more options the employer has—the stronger the match the employer will find.

82.115.    Through these processes—employers competing for workers, workers competing for jobs, and employers and workers matching with one another—competition in the labor market leads to higher earnings for workers, greater productivity for employers, and better economic conditions.

83.116.    In a perfectly competitive labor market, if a job that a worker would prefer more—for example, because it has higher pay or is in a better location—were to become available, the worker could switch to it quickly and easily. Due to this ease of switching, in a perfectly competitive labor market, workers would easily match to the optimal job for them. If a worker were to find themselves in a job where the combination of their happiness and productivity is less than in some other job, they would simply switch jobs, making themselves better off.

117.   However, this perfectly competitive labor market exists only in theory. In practice, labor markets deviate substantially from perfect competition.

Formatted: Left

84.118.   Non-compete clauses, in particular, impair competition in labor markets by restricting a worker's ability to change jobs. If a worker is bound by a non-compete clause, and the worker wants a better job, the non-compete clause will prevent the worker from accepting a new job that is within the scope of the non-compete clause.

85.119.   The broader the scope of the non-compete clause, the greater the transaction costs are on the employee looking to switch to a new job.

86.120.   The result is less competition among employers for the worker's services and less competition among workers for available jobs. Since the worker is prevented from taking these jobs, the worker may decide not to enter the labor market at all. Or the worker may enter the labor market but take a job in which they are less productive, such as a job outside their field.

87.121.   By inhibiting optimal matches from being made between employers and workers across the labor force, non-compete clauses reduce the earnings of workers.

88.122.   In addition to reducing the earnings of workers, numerous studies have shown that they also have negative and broader impacts on competition. The effects outline below identify a few of these anticompetitive effects.

89.123.   Foreclosing Competitors' Ability to Access Talent: Non-compete clauses foreclose the ability of competitors to access talent by effectively

Formatted: Left

34

forcing future employers to buy out workers from their non-compete clauses if they want to hire them. Firms must either make inefficiently high payments to buy workers out of non-compete clauses with a former employer, which leads to deadweight economic loss, or forego the payment—and, consequently, the access to the talent the firm seeks. Whatever choice a firm makes, its economic outcomes in the market are harmed.

90.124.    New Business Formation: Academic research indicates non-compete clauses likely have a negative impact on new business formation.

91.125.    Recent evidence that new business formation is trending downward has led to concerns that productivity and technological innovation are not as strong as they would have been had new business formation remained at higher levels. Non-compete clauses restrain new business formation by preventing workers subject to non-compete clauses from starting their own businesses. In addition, firms are more willing to enter markets in which they know there are potential sources of skilled and experienced labor, unhampered by non-compete clauses.

92.126.    Innovation: Academic research indicates non-compete clauses decrease innovation.

93.127.    Innovation may directly improve economic outcomes by increasing product quality or decreasing prices, or may promote competition because successful new products and services force competing firms to improve their own

Formatted: Left

products and services. Non-compete clauses affect innovation by reducing the movement of workers between firms, which decreases knowledge flow between firms. Non-compete clauses also prevent workers from starting businesses in which they can pursue innovative new ideas.

ii.   Defendants' Use of the ~~Non-Compete Provisions~~Restrictive Covenant Device, the ~~FPCs~~Conditioned Payment Device, and the Separation Agreements Causes Anticompetitive Effects in the ~~ECM~~Equity Capital and IDB ~~markets~~Labor Markets.

~~94.~~128.   Here, Plaintiffs are professionals in the ~~ECM~~Equity Capital and IDB ~~markets.~~Labor Markets.

~~95.~~129.   Defendants' use of the ~~Non-Compete Provisions~~Restrictive Covenant Device, the ~~FPCs~~Conditioned Payment Device, and the Separation Agreements stifle ~~their~~Plaintiffs' ability to compete with Defendants by looking for better opportunities for employment.

~~96.~~130.   Defendants' anticompetitive use of these provisions not only harms the ability for competitors in the ~~ECM~~Equity Capital and IDB ~~markets~~Labor Markets to have access to labor and services provided by Plaintiffs and the class, but it also harms future competition for the provision ~~ECM and IDB~~of services in these markets directly from Plaintiffs.

~~97.~~131.   Accordingly, because Plaintiffs were professionals in the ~~ECM~~Equity Capital and IDB ~~markets~~Labor Markets at the time they signed the Partnership Agreements with Defendants, they were actual or potential competitors

36

Formatted: Left

of Defendants when they agreed to the non-competes. The contractual provisions thus stifle innovation and new firm creation in the ~~ECM~~Equity Capital and IDB ~~markets~~Labor Markets.

~~98.   Because the restraints were imposed by agreements between competitors on the way they will compete with one another in the future, Defendants' use of these provisions is a horizontal restraint on trade.~~

132.   Foreclosing Competitors' Ability to Access Talent: CFLP and BGC's use of the Restrictive Covenant Device, the Conditioned Payment Device, and the Separation Agreements operates to foreclose its competitors from the ability to hire its talented professionals. Because CFLP and BGC's highest performing professionals are often owed millions of dollars in Conditioned Payments, the Conditioned Payment Device and the Separation Agreements operate to make it cost prohibitive to hire CFLP and BGC's best talent.

133.   Incredibly, this is true *even if* one of CFLP or BGC's top talents is terminated involuntarily. Because the Conditioned Payment Devices and the restrictive clauses in the Separation Agreement are in force even if a limited partner is terminated, it is cost prohibitive for competitors to hire limited partners who are no longer employed by Defendants as well.

134.   New Business Formation and Innovation: CFLP and BGC's use of the Restrictive Covenant Device, the Conditioned Payment Device, and the Separation

37

Agreements operates to restrict both new business formation and innovation in Equity Capital Market and the IDB Market.

135.   Indeed, these restrictions have a more significant impact on restricting new business formation than foreclosing the ability for competitors to hire talent away from Defendants. That's because new business formation typically requires significant risk and the capital used early on in a new business typically needs to go towards growth rather than payments to founders.

136.   Former limited partners who want to start a new business must not only then take on the risk associated with a new venture, but they must also forfeit significant earned compensation to so.

137.   These restrictions also limit innovation by preventing limited partners in the Equity Capital and IDB Markets from forming new businesses that innovate on the financial products Defendants offer.

## V.   CLASS INJURY AND STANDING

99.138.   Plaintiffs and each class member have suffered injury of the type the antitrust laws were intended to prevent and flows from that which makes Defendants' act unlawful.

100.139.   Plaintiffs and each class member allege that Defendants' anticompetitive conduct has caused them to forfeit substantial compensation they

Formatted: Left

received in connection with their employment with Defendants. Such an injury is plainly of the type the antitrust laws were intended to prevent.

101.140.    Defendants' misconduct has directly caused this injury to Plaintiffs and each class. Plaintiffs and each class are naturally motivated to enforce the antitrust laws because they had and have the natural economic self-interest in paying reasonable rather than supracompetitive pricesbeing paid competitive compensation rather than compensation that is insulated from competition through the unlawful restrictions contained in each of the Partnership Agreements and Separation Agreements.

**VI.    CLASS ALLEGATIONS**

102.141.    Plaintiffs bring this action on behalf of themselves and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of all persons who were limited partners in any of Defendants' Partnership Agreements and who, after they left employment from Defendants, were denied payment of any Grant Units, Working Partner Units, or HDII Unitsthe Conditioned Amounts they were owed.

103.142.    This class excludes (i) Defendants and (ii) the Judge, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

**Formatted:** Left

104.143.    Plaintiffs reserve the right to amend any of these class definitions if further investigation, discovery, or both indicate that such definitions should be narrowed, expanded, or otherwise modified.

105.144.    The members of each class are so numerous that joinder of all members is impracticable. The precise number of members of eachthe class is unknown to Plaintiffs at this time, but it is believed to be over a thousand.

106.145.    Defendants have acted on grounds that apply generally to the members of each class, so that final injunctive relief is appropriate respecting each class as a whole.

107.146.    Common questions of law and fact exist as to all members of each class and predominate over any questions solely affecting individual members of each class. Such common issues include:

(a) Whether the Non-Compete ProvisionsRestrictive Covenant Device, the FPCsConditioned Payment Device, and the Separation Agreements are enforceable under Delaware law;

(b) Whether Cantor FitzgeraldCFLP and BGC's use of the Partnership Agreements and Separation Agreements to restrain trade and suppress wages violates Section 1 of the Sherman Act under the *per se*, quick look, or rule of reason modes of analysis;

(c) The proper measure of damages; and

(d) The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

**Formatted:** Left

108.147.  Plaintiffs' claims are typical of the claims of the other members of each class they seek to represent. Defendants' practices have targeted and affected all members of each class in a similar manner, *i.e.*, they have all been denied compensationpayment of the Conditioned Amounts they are owed as a result of Defendants anticompetitive behavior.

109.148.  Plaintiffs will continue to fully and adequately protect the interests of the members of each class. Plaintiffs have retained counsel competent and experienced in antitrust class actions. Plaintiffs have no interests in conflict with those of any class.

110.149.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

111.150.  The prosecution of separate actions by individual members of each class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the classes.

112.151.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

Formatted: Left

41

~~113.~~152.    The interests of the members of each class in individually controlling the prosecution of separate actions are theoretical rather than practical. The classes each have a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

**VII.   CLAIMS FOR RELIEF**

**COUNT I**
**Breach of Contract**
**(Against all Defendants)**

~~114.~~153.    Plaintiffs incorporate the allegations above.

~~115.~~154.    Plaintiffs and members of ~~both classes~~the class are former limited partners in CFLP, BGC, and/or Newmark. Such partnership status was thereafter terminated when ~~Plaintiffs and members of both classes~~Plaintiffs' employment with Defendants ended.

~~116.~~155.    Defendants have since wrongfully failed and refused to ~~make required payments~~pay the Conditioned Amounts for the repurchase of ~~Plaintiffs and members of both classes' Grant and HDII Units~~Plaintiffs' and the class's various partnership interests as ~~it is~~Defendants are required to ~~do so under~~pay pursuant to the Partnership Agreements and the Separation Agreements.

~~117.~~156.    Plaintiffs and class members ~~of both classes~~ have been damaged by Defendants' breach and they are entitled to payment that includes the value of the

**Formatted:** Left

~~Grant and HDII Units~~Conditioned Amounts that Defendants have ~~been~~ wrongfully withheld.

**<u>COUNT II</u>**
**Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act**
**(Against CFLP and BGC)**

~~118.~~157.    Plaintiffs incorporate the allegations above.

~~119.~~158.    CFLP and BGC's Partnership Agreements constitute unreasonable restraints of trade because they have caused substantial anticompetitive effects in the ~~ECM~~Equity Capital and IDB ~~markets~~Labor Markets without procompetitive justification.

~~120.~~159.    CFLP and BGC's use of the ~~Non-Compete Provisions~~Restrictive Covenant Device, the ~~FCPs~~Conditioned Payment Device, and the similar contractual provisions contained in each Separation ~~Agreements~~Agreement have harmed competition by:

- Harming the competitive process and disrupting the proper function of the wage-setting mechanism of a free labor market;

- Insulating CFLP and BGC from competition from rivals in the ~~ECM~~Equity Capital and IDB ~~markets~~Labor Markets that would otherwise hire Plaintiffs and members of the class;

- Restraining Plaintiffs and the class from seeking better offers for their services and employment;

43

- Restraining Plaintiffs and the class from building startups that offer competing services to participants in the ~~ECM~~Equity Capital and IDB ~~industries~~Markets; and

- Stifling innovation in the ~~ECM~~Equity Capital and IDB ~~industries~~Markets that would emerge if Plaintiffs and class members ~~could~~were free to build competing businesses;

~~121.~~160.   As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and each class member has suffered pecuniary injury.

~~122.~~161.   Defendants' conduct is unlawful under a per se mode of analysis. In the alternative, Defendants' conduct is unlawful under either a quick look or a rule of reason mode of analysis.

~~123.~~162.   Under section 4 of the Clayton Act, Plaintiffs and each class are entitled to treble damages and reasonable attorneys' fees for these injuries.

~~124.~~163.   Under section 16 of the Clayton Act, Plaintiffs and each class are also entitled to injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

(a) Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), that Plaintiffs be appointed class representatives, and that Plaintiffs' counsel be appointed as class counsel;

(b) A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act under either a quick look or rule of reason analysis;

**Formatted:** Left

44

(c) Issue an injunction to enjoin Defendants from continuing to engage in the anticompetitive conduct alleged in this Complaint;

(d) Award compensatory damages to Plaintiffs and the proposed classes in an amount to be established at trial;

(e) Award treble damages as permitted by law;

(f) Award pre- and post-judgment interest;

(g) Award reasonable attorneys' fees and costs; and

(h) Award any other and further relief as may be just and proper.


Dated: ~~March 9~~May 31, 2023


/s/ *Blake A. Bennett*
Blake A. Bennett (#5133)
COOCH & TAYLOR P.A.
The ~~Nemours~~Brandywine Building
~~1007~~1000 N. ~~Orange~~West Street, Suite ~~1120~~1500
Wilmington, DE 19801
(T): (302) 984-3800

Kyle W. Roche
(*pro hac vice application forthcoming*)
KYLE ROCHE P.A.
260 Madison Avenue, 8th Fl. ~~New York, NY 10016~~
New York, NY 10016
kyle@kyleroche.law

*Attorneys for Plaintiffs*

**Formatted:** Left

46