## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHAWN MCLOUGHLIN, ROBERT MILLER, ANGELO SOFOCLEOUS, ANDREW LEWIS, CHEYNE BUNNETT, TOM ROBERTSHAW, and OLIVIA SCOTT (as the personal representative of the ESTATE OF RUSSELL SCOTT), <br><br> Plaintiffs, <br><br> v. <br><br> CANTOR FITZGERALD, L.P., BGC HOLDINGS, L.P., and NEWMARK HOLDINGS, L.P., <br><br> Defendants. | C.A. No. 23-256-CFC |

## DEFENDANTS' OPENING BRIEF
## IN SUPPORT OF THEIR MOTION TO DISMISS THE SECOND
## AMENDED COMPLAINT

Dated: March 22, 2024

CANTOR FITZGERALD
David A. Paul
Mitchell Nobel
110 E. 59th Street, 7th Floor
New York, New York 10022
(212) 610-2298
dpaul@cantor.com
mitchell.nobel@cantor.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
C. Barr Flinn (No. 4092)
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
bflinn@ycst.com
agaza@ycst.com

rvrana@ycst.com

SIDLEY AUSTIN LLP
Benjamin R. Nagin
Eric G. Hoffman
787 Seventh Avenue
New York, NY 10019
(212) 839 5911
bnagin@sidley.com
ehoffman@sidley.com

Tacy F. Flint
Frank J. Favia, Jr.
One South Dearborn
Chicago, IL 60603
(312) 853 7875
tflint@sidley.com
ffavia@sidley.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS AND SUMMARY OF ARGUMENT ........................................................................................1

STATEMENT OF FACTS ...............................................................3

ARGUMENT ....................................................................................5

I.   PLAINTIFFS FAIL TO STATE A SHERMAN ACT CLAIM. .....................5

  A.  Plaintiffs Have Not Pled Antitrust Injury. .......................................5

  B.  Plaintiffs Do Not Allege a Cognizable Agreement. ........................7

  C.  Plaintiffs Fail to Satisfy the Rule of Reason. .................................8

     1.  The Competition Conditions Are Properly Analyzed
     Under the Rule of Reason. ..............................................................9

     2.  Plaintiffs Fail to Allege a Violation of the Rule of Reason. ......................11

  D.  Plaintiffs' Sherman Act Claims Are Untimely.............................18

II.  PLAINTIFFS' DECLARATORY JUDGMENT CLAIM
IS DEFICIENT AND DUPLICATIVE ....................................................19

III. PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS ..........................19

IV.  PLAINTIFFS MCLOUGHLIN AND SOFOCLEOUS
FAIL TO ALLEGE A VIOLATION OF THE COVENANT
OF GOOD FAITH AND FAIR DEALING ............................................21

V.   THE SEPARATION AGREEMENTS ADDITIONALLY
BAR SOME PLAINTIFFS' CLAIMS ....................................................22

  A.  Plaintiffs McLoughlin's and Miller's Claims Are Time-Barred...................22

  B.  Plaintiffs McLoughlin, Miller, and Sofocleous Released Their Claims. ......23

  C.  The Other Plaintiffs Do Not State Any Claim Against BGC or Newmark. .23

CONCLUSION ...............................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.D.M. Corp. v. Sigma Instruments, Inc.*,
  628 F.2d 753 (1st Cir. 1980) ...................................................................7

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ...............................................................................6

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
  974 F.2d 1358 (3d Cir. 1992) ...............................................................10

*Borg-Warner Protective Services Corp. v. Guardsmark, Inc.*,
  946 F. Supp. 495 (E.D. Ky. 1996)...........................................................8

*Brokerage Concepts v. United States Healthcare*,
  140 F.3d 494 (3d Cir. 1998) .................................................................11

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ...............................................................................6

*Buck v. Hampton Tp. Sch. Dist.*,
  452 F.3d 256 (3d Cir. 2006) ...................................................................4

*Butta v. GEICO Casualty Co.*,
  400 F. Supp. 3d 225 (E.D. Pa. 2019)....................................................19

*Cantor Fitzgerald, L.P. v. Ainslie*,
  No. 162, 2023, 2024 WL 315193 (Del. Jan. 29, 2024) ............... passim

*Cantor Fitzgerald, L.P. v. David Demos*,
  2019-0193 (Del. Ch. Apr. 28, 2020) .....................................................21

*Caremark Homecare, Inc. v. New England Critical Care, Inc.*,
  700 F. Supp. 1033 (D. Minn. 1988) ........................................................8

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ...........................................................................7, 8

*Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*,
  833 F.3d 399 (3d Cir. 2016) ........................................................... 17, 18

*DV Realty Advisors LLC v. Policemen's Annuity & Ben. Fund of Chicago*,
  75 A.3d 101 (Del. 2013).........................................................................21

*Eichorn v. AT&T Corp.*, 248 F.3d 131 (3d Cir. 2001) ............................... 10, 12, 17

*Exit Strategy, LLC v. Festival Retail Fund BH, L.P.*,
   No. 2017-0017-NAC, 2023 WL 4571932 (Del. Ch. July 17, 2023) ..................21

*Gordon v. Lewistown Hosp.*, 423 F.3d 184 (3d Cir. 2005).....................................15

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
   32 F.4th 242 (3d Cir. 2022) ............................................................................. 5, 16

*Koenig v. Automatic Data Processing*,
   2003 U.S. Dist. LEXIS 26812 (D.N.J. 2003) .......................................................8

*Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007).....................10

*Mark DutchCo 1 B.V. v. Zeta Interactive Corp.*,
   411 F. Supp. 3d 316 (D. Del. 2019) ...................................................................23

*McDonald v. Johnson & Johnson*, 722 F.2d 1370 (8th Cir. 1983) ...........................7

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
   922 F.3d 713 (6th Cir. 2019) ........................................................................ 10, 11

*NCAA v. Alston*, 594 U.S. 69 (2021) ................................................................... 9, 10

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ..................................... 8, 15, 17, 18

*Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358 (3d Cir. 1996)...........................9

*Queen City Pizza Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ........................................................................ 11, 14

*Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*,
   113 F.3d 405 (3d Cir. 1997) ...............................................................................14

*Siegel Transfer, Inc. v. Carrier Exp., Inc.*, 54 F.3d 1125 (3d Cir. 1995). ...............7

*Texaco v. Dagher*, 547 U.S. 1 (2006) ....................................................................11

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*,
   89 F.4th 430 (3d Cir. 2023) .................................................................................9

*Zenith Radio Corp. v. Hazeltine Rsch.*, 401 U.S. 321 (1971)................................18

**Statutes**

15 U.S.C. §15 ...........................................................................................................21

## NATURE AND STAGE OF THE PROCEEDINGS AND SUMMARY OF ARGUMENT

Plaintiffs are now on their third attempt to allege plausible claims. But time has not been kind to Plaintiffs' action. The impetus for Plaintiffs' initial complaint was a Delaware Chancery Court decision finding provisions in Defendants' limited partnership agreements to be unenforceable. Plaintiffs hoped to extend that decision to a broad class, both through class-wide breach of contract allegations and a purported antitrust claim. Plaintiffs cited the Court of Chancery's decision throughout their complaint and their responses to Defendants' motions to dismiss, arguing that the Court of Chancery's finding allowed them to avoid pleading core elements of their claims. But then the Delaware Supreme Court cut the already-weak foundation out from underneath Plaintiffs, reversing the Court of Chancery and holding that the provisions Plaintiffs challenge are lawful, enforceable under Delaware law, and "do[] not restrict competition." *Cantor Fitzgerald, L.P. v. Ainslie*, No. 162, 2023, 2024 WL 315193 at 11 (Del. Jan. 29, 2024).

In the wake of *Ainslie*, Plaintiffs have filed a Second Amended Complaint ("SAC") attempting to bolster their antitrust claims and refashion their contract claims into antitrust claims. D.I. 42. But this pleading, like Plaintiffs' two prior complaints, is fatally flawed, because it fails to allege basic elements required for each claim.

Plaintiffs' antitrust claims, which were doomed even before *Ainslie*, remain entirely meritless for several reasons.

Plaintiffs have failed to allege antitrust injury. Instead, they seek the breach of contract damages now rejected in *Ainslie*: payment of funds to which they are not entitled under the terms of the enforceable competitive activity conditions. Defendants' compliance with contractual terms upheld by the Delaware Supreme Court is not an injury to competition. This alone merits dismissal.

Plaintiffs have not alleged an actionable agreement, as the agreements in question were made within the Defendant partnerships. Plaintiffs have no response to controlling Third Circuit law holding that such agreements cannot violate the Sherman Act. This failure is another independent basis for dismissal.

Plaintiffs' antitrust claims also fail to allege facts that satisfy the rule of reason. The rule of reason, which the Third Circuit has held governs vertical agreements like those alleged here, requires detailed allegations of relevant markets, market power, and anticompetitive effect. Plaintiffs allege only fictitious, made-for-litigation markets without quantitative support, and base their conclusory market power and anticompetitive effects allegations primarily on the very limited partnership agreement provisions the Delaware Supreme Court has now endorsed.

Plaintiffs also fail to grapple with the untimely nature of their antitrust claims, or the fact that some of their claims are also released.

Plaintiffs' breach of contract claim fares even worse following *Ainslie*. This claim now relies entirely on the flawed antitrust claim to inappropriately suggest that federal law can supplant the Delaware Supreme Court's holding on the enforceability of agreements under Delaware law.

Finally, Plaintiffs McLoughlin and Sofocleous bring new, individual claims for the breach of the implied covenant. These claims fail to meet the high standard Delaware law places on such claims. Accordingly, the Court should dismiss the SAC with prejudice.

## STATEMENT OF FACTS

Plaintiffs McLoughlin and Miller are former limited partners of Defendants BGC Holdings, L.P. ("BGC") and Newmark Holdings, L.P. ("Newmark"). (SAC ¶¶18-19.) Plaintiffs Sofocleous, Lewis, Bunnett, Robertshaw, and Scott[1] are former limited partners of Defendant Cantor Fitzgerald, L.P. ("CFLP"). (*Id.* ¶¶20-24.)

To become limited partners, Plaintiffs alleged they executed one or more of the following agreements: the 2008 CFLP Partnership Agreement, the 2017 BGC Partnership Agreement, and the 2017 Newmark Partnership Agreement.[2] (*Id.* ¶3.)

---

[1] Russell Scott is deceased; Olivia Scott is the personal representative of his estate and the applicable Plaintiff.
[2] The SAC incorporates the BGC and Newmark Partnership Agreements and the Separation Agreements (*e.g.*, SAC ¶¶3, 60.) The Court may consider them on a

The Partnership Agreements provide that, in connection with the redemption of their units, terminated partners may be entitled to certain installment payments—what the SAC refers to as "Conditioned Amounts"—over four years, beginning one year after departing. (*Id.* ¶36-37, 40.)[3] The partner must satisfy certain conditions precedent to receive these payments (*id.* ¶¶38-39), including refraining from competing with and soliciting employees or clients from the partnership. (D.I. 20-1 §12.02(c), 20-2 §12.02(c)).[4] Moreover, the Partnership Agreements each establish a one-year limitations period (from the date of redemption of partnership units or notice thereof) for challenges to "the terms, conditions, or validity" of a redemption. (*Id.* §13.19(a).)

Additionally, Plaintiffs McLoughlin, Miller, and Sofocleous each signed a Separation Agreement. (SAC ¶¶71, 74.) These Separation Agreements redeemed partnership units in exchange for installment payments over four years following separation, but conditioned these payments on compliance with requirements such as not disclosing confidential information, not soliciting employees or clients, and

---

motion to dismiss. *See Buck v. Hampton Tp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

[3] Plaintiffs attempt to recycle their claim that the payments at issue are "vested property interests." (SAC ¶53.) But *Ainslie* already rejected this argument, finding that the Conditioned Payment provisions are "condition[s] precedent" to payment. 2024 WL 315193, at *8-9.

[4] Plaintiffs cite to "Exhibit 1" and "Exhibit 2" even though the SAC has no exhibits. (SAC ¶39). Plaintiffs thus incorporate by reference the exhibits to the Amended Complaint.

not competing against the partnership or any affiliate.[5] These Agreements also contain a broad release of "all claims…in law or equity…relating to…any alleged action, inaction, conduct, omission, or other circumstance or facts existing or arising through" the effective date of the applicable agreement.[6]

## ARGUMENT

### I. PLAINTIFFS FAIL TO STATE A SHERMAN ACT CLAIM.

Plaintiffs fail to allege facts establishing: (1) antitrust injury, (2) a cognizable agreement, or (3) anticompetitive effects such that any restraint of trade would be unreasonable. At bottom, Plaintiffs seek only contractual payments and have failed to contort their now-impossible state law breach-of-contract claims into an antitrust claim. Additionally, Plaintiffs' claims are untimely.

#### A. Plaintiffs Have Not Pled Antitrust Injury.

To establish antitrust standing, Plaintiffs must allege "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant[s'] acts unlawful.'" *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 249-50 (3d Cir. 2022). Plaintiffs' sole antitrust injury allegation is that they "forfeit[ed] substantial compensation" by failing to satisfy the Conditioned Payment provisions. (SAC ¶¶ 201-03.)[7]

---

[5] *See* DI 26-1 to 26-5 §2(b).

[6] D.I. 26-1 to 26 §5.

[7] This is confirmed by the proposed class definition, which encompasses "all persons who were limited partners in any of Defendants' Partnership Agreements

These desired payments, however, are not antitrust injury. Competitors who suffer harm—even if that harm is caused by a defendant's anticompetitive practices—lack antitrust standing unless their harm "stems from a competition-reducing *aspect* or *effect* of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis added). Here, the lost payments do not stem from any competition-reducing aspect or effect of Plaintiffs' limited partnership agreements with Defendants but rather from the fact that competition *was not reduced*. In other words, the payments are "profits [Plaintiffs] would have realized had competition been reduced," which the Supreme Court has made clear are *not* antitrust injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); *see also Ainslie*, 2024 WL 315193, at *11 (Conditioned Payment provisions "do[] not restrict competition or a former partner's ability to work.").

Indeed, courts consistently recognize that plaintiffs who voluntarily covenant not to compete cannot allege antitrust injury, as any harm they experience derives from the contract terms they chose to accept, and not from reduced competition in the market. *See McDonald v. Johnson & Johnson*, 722 F.2d 1370,

_____

and who, after they left employment from Defendants, were denied payment of the Conditioned Amounts they were owed." (SAC ¶204.) The proposed class thus includes individuals who were never even arguably within Plaintiffs' alleged markets.

1374 (8th Cir. 1983) (plaintiffs signed covenant-not-to-compete and thus lacked

standing to sue for anticompetitive conduct); *A.D.M. Corp. v. Sigma Instruments,*

*Inc.*, 628 F.2d 753, 754 (1st Cir. 1980) (defendant's breach of contract in which

plaintiff agreed to refrain from competition was "lacking the essential connection

between injury and the aims of the antitrust laws").

### B.      Plaintiffs Do Not Allege a Cognizable Agreement.

Independent of their failure to allege antitrust injury, Plaintiffs allege no

agreements within the scope of Section 1, which does not reach alleged agreements

in which the participants are within the same corporate enterprise. *See Copperweld*

*Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769-70 (1984).  The Third

Circuit has explained that "Section 1 does not capture coordinated activity among

the employees and officers of the same firm or police 'internal agreements'

between a corporation and these individuals." *Siegel Transfer, Inc. v. Carrier*

*Exp., Inc.*, 54 F.3d 1125, 1134 (3d Cir. 1995).

Plaintiffs' claims are inconsistent with *Copperweld* because they challenge

only agreements between partners within a single corporate structure, the "CFLP

and BGC's Partnership Agreements," as "unreasonable restraints of trade."  (SAC

¶217.)  These agreements, between limited partners and the partnerships, were all

in furtherance of a broader enterprise from which Plaintiffs benefitted. *See Ainslie*,

2024 WL 315193, at 4 (restrictions on competition for departing partners "redounded to the plaintiffs' benefit during their tenure as partners").

Plaintiffs' claims are therefore barred by *Copperweld*'s holding that "officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy." 467 U.S. at 769. *See Koenig v. Automatic Data Processing*, 2003 U.S. Dist. LEXIS 26812, at *12-13 (D.N.J. 2003), *aff'd*, 156 F. App'x 461, 468 (3d Cir. 2005)("[A]n attack on the existence of the non-compete language in the severance agreement falls short of establishing…illegal, concerted action."); *Borg-Warner Protective Services Corp. v. Guardsmark, Inc.*, 946 F. Supp. 495, 499-500 (E.D. Ky. 1996); *Caremark Homecare, Inc. v. New England Critical Care, Inc.*, 700 F. Supp. 1033, 1035 (D. Minn. 1988). As these cases recognize, non-compete agreements are internal and thus cannot be the basis for a Section 1 claim under *Copperweld*.

## C. Plaintiffs Fail to Satisfy the Rule of Reason.

Plaintiffs have failed to allege an unreasonable restraint of trade. Because Plaintiffs do not allege one of the few types of agreements that may be a *per se* antitrust violation, they must satisfy the rule of reason by defining a market, alleging market power, and showing a substantial anticompetitive effect that harms consumers. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018). Plaintiffs cannot meet these obligations.

### 1. The Competition Conditions Are Properly Analyzed Under the Rule of Reason.

"Determining whether a restraint is undue for purposes of the Sherman Act presumptively calls for what [the Supreme Court] ha[s] described as a rule of reason analysis." *NCAA v. Alston*, 594 U.S. 69, 81 (2021) (internal quotation marks omitted).

First, courts consistently apply the rule of reason to cases like this one where plaintiffs allege "vertical" agreements between buyers and sellers in a market— here, buyers and sellers of labor. *See Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1368 (3d Cir. 1996) ("[V]ertical restraints of trade…are evaluated under the rule of reason."); *see also id.* ("Agreements between entities at different market levels are termed 'vertical restraints.'"); *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 441 (3d Cir. 2023) (even when agreement "falls in between" purely horizontal and purely vertical, "the rule of reason applies.").

Plaintiffs try to escape the obvious need to apply the rule of reason by contending that the agreements "qualify as horizontal restraints" because of their alleged effect "on the way [Plaintiffs and Defendants] will compete with one another in the future." (SAC ¶94.) Plaintiffs' (literally) sideways analysis would mean that every employment agreement is horizontal, because every employee could theoretically one day work for or start a competing business. But as the Third Circuit has advised, whether an agreement is horizontal or vertical depends

on "determining which kind of an arrangement produces the restraint rather than analyzing its anticompetitive effects." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1376 (3d Cir. 1992).

Second, rule of reason analysis is separately required because the agreements are not among the enumerated "categories of restraints" for which a departure from the rule of reason is permitted. *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007). The Supreme Court has explained that courts should not apply heightened scrutiny, such as a *per se* or quick-look rule, unless they "have amassed considerable experience with the type of restraint at issue and can predict with confidence that it would be invalidated in all or almost all instances." *Alston*, 594 U.S. at 89 (cleaned up). Restrictive covenants are not among these categories, because they are frequently upheld. *See Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 731 (6th Cir. 2019) (courts "have long recognized that legitimate reasons exist to uphold noncompetition covenants even though by nature they necessarily restrain trade to some degree.") (cleaned up).

Indeed, for this reason, the Third Circuit has held that *even purely horizontal* restrictive covenants are evaluated under the rule of reason. *See Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001) ("[C]ourts have uniformly found that

covenants not to compete should be examined under the rule of reason").[8]  This

Court should not disrupt that uniform treatment.  The rule of reason applies here.

### 2.    Plaintiffs Fail to Allege a Violation of the Rule of Reason.

#### a.    Plaintiffs Fail to Define Relevant Markets

The rule of reason first requires Plaintiffs to make allegations "defining the

relevant market," *Queen City Pizza Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436

(3d Cir. 1997), including both product and geographic markets, *Brokerage*

*Concepts v. United States Healthcare*, 140 F.3d 494, 513 (3d Cir. 1998).  When

Plaintiffs either fail to define a market "with reference to the rule of reasonable

interchangeability and cross-elasticity of demand" or allege a proposed market that

"clearly does not encompass all interchangeable substitute products even when all

factual inferences are granted in plaintiff's favor," the proposed market is "legally

insufficient and a motion to dismiss may be granted."  *Queen City Pizza*, 124 F.3d

at 442.  Plaintiffs' proposed markets are not adequately defined.

Plaintiffs propose a number of putative markets, namely a "Middle Market

Investment Bank Labor Market", an "Equity Capital Labor Submarket," a "Trader

---

[8] Plaintiffs' invocation of "quick look" review is similarly foreclosed by *Eichorn*. The quick look standard applies only "to business activities that are so plainly anticompetitive that courts need undertake only a cursory examination before imposing anti-trust liability."  *Texaco v. Dagher*, 547 U.S. 1, 7 n.3 (2006).  The non-competition conditions here are just as ill-suited for a "quick look" analysis as they are for *per se* condemnation.  *See Atrium Health Sys.*, 922 F.3d at 731.

Labor Submarket," and an "Interdealer Broker Labor Market."[9]  These markets are not defined in accord with Third Circuit law.

The Third Circuit has explained that an appropriate labor market consists of employers "who actively compete for employees with the skills and training possessed by plaintiffs."  *Eichorn*, 248 F.3d at 147-48.

Plaintiffs' alleged markets are implausibly narrow.  Plaintiffs make conclusory allegations concerning "interchangeability" and "cross-elasticity" but do not put forth any facts supporting those assertions.  (SAC ¶¶110-112, 136-138.) For example, Plaintiffs do not support the allegation that those currently working for a so-called "Middle-Market" investment bank or IBD would not be employable by other investment banks and financial institutions and vice versa.  While Plaintiffs allege the supposed existence of different *services* markets for investment banks of different sizes (SAC ¶¶102-107), that is irrelevant to the *labor* markets at issue.  Plaintiffs themselves acknowledge that investment banks of different sizes "work on the same large, complex transactions," suggesting that employees in one investment bank could be hired by a bank of a different size. (SAC ¶106.)

---

[9] Plaintiffs never allege that Newmark competed in these markets, which is fatal to antitrust claims against Newmark.

But Plaintiffs' proposed markets are also too broad, encompassing putative class members who have little in common beyond their employers. Plaintiffs take the position that McLoughlin, a former CEO (SAC ¶18), and Robert Miller, the Head of US Credit Products (SAC ¶19), were both in the IDB Labor Market, without alleging either's job responsibilities. Similarly, the Middle Market Investment Bank Labor Market is alleged to include both the CEO of Cantor Fitzgerald Europe (SAC ¶20) and traders who "execute the buy and sell transactions within a middle market investment bank" (SAC ¶119). Plaintiffs imply that, because Cantor is a middle market investment bank, all of its partners and employees are in the Middle Market Investment Bank Labor Market. But this employer-as-market model is contrary not only to *Eichhorn* but also to the common-sense point that a single employer participates in many different labor markets.

Plaintiffs allege no facts or quantitative support in support of these implausible markets. While Plaintiffs recite the elements of the relevant tests, they fail to allege any specific facts and use virtually identical language for their two different markets. (*Compare* SAC ¶¶110-114 *with* ¶¶136-140.) Plaintiffs present no quantitative analysis of either market, and do not allege that these professionals cannot seek employment beyond the purported market using their skills and experience.

Plaintiffs likewise fail to allege a geographic market. Plaintiffs point to a "nationwide" market based on Defendants' internal organization and locations. (SAC ¶¶151-56.) Plaintiffs say nothing, however, as to the geographic interchangeability or cross-elasticity of potential employees, as would be required to demonstrate whether a putative *labor* market is nationwide. *See Queen City Pizza*, 124 F.3d at 43. Plaintiffs then confusingly allege that "Defendants also compete for labor locally," again without reference to interchangeability, substitutes, or cross-elasticity. (SAC ¶157.) Moreover, neither national nor local markets are consistent with the allegation that five Plaintiffs (Sofocleous, Lewis, Bunnett, Robertshaw, and Scott) work outside the United States, placing them outside the putative "nationwide" market. (SAC ¶¶21-24.)[10] Thus, while it is not clear what geographic market Plaintiffs intend to allege, they have not alleged any market that aligns with the injury for which they seek redress.

---

[10] For this reason, these Plaintiffs' claims must be dismissed. *See Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 415 (3d Cir. 1997). A restriction on someone who was not a participant in a labor market could not affect that market. To the extent that Plaintiffs argue that restrictions on foreign employees are relevant because Defendants compete for labor internationally, (*see* SAC ¶193), that only underscores the deficiency of their geographic market allegations.

### b. Plaintiffs Fail to Allege Defendants' Market Power or Actual Anticompetitive Effects

Plaintiffs also fail to carry their "initial burden" of pleading that "the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express Co.*, 585 U.S. at 542.

### (i) Market Power

Plaintiffs first attempt to carry their burden by alleging "market power plus some evidence that the challenged restraint harms competition." *Id.* But their market power allegations are woefully deficient.

Plaintiffs never allege the market share of any Defendant in any supposed labor market. They only allege BGC's 34% share in the market for IDB *services* (not employees), Cantor's 125-strong equity capital markets team, and that both have networks of customers. (SAC ¶¶128-29, 144-45, 149-50.) Plaintiffs therefore do not come close to alleging that Defendants consume more than half of the nationally available labor in any labor market, which is necessary to show market power. *See Gordon v. Lewistown Hosp.*, 423 F.3d 184, 213 (3d Cir. 2005) (recognizing that "50% share is insufficient as a matter of law to establish market power").

Plaintiffs instead attempt to show market power primarily from the fact that Defendants enforce the Partnership Agreements that the Delaware Supreme Court has held to be enforceable. Plaintiffs first attempt to locate market power in the

fact that employees must sign the limited partnership agreement to become limited partners. (SAC ¶¶123, 142.) This is circular reasoning: Plaintiffs say the agreements are unlawful because Defendants have market power and then say the Defendants must have market power because they enter into the agreements. This argument would wrongly imply that every limited partnership has market power if the limited partners sign a standard agreement. *See Host Int'l*, 32 F.4th at 250 ("An objectionable term in a commercial agreement, without more, is not an antitrust violation…."). Plaintiffs' second attempt alleges lower compensation (SAC ¶¶125, 146), but the supposedly lower compensation comes exclusively from Defendants' enforcement of the Competitive Activity Conditions approved by the Delaware Supreme Court; the compensation is thus only "lower" than the compensation Plaintiffs would be owed if *Ainslie* had been resolved in their favor. And Plaintiffs' third supposed market-power theory is yet another rehash: the allegation that competitors are affected by Defendants' enforcement of these provisions. (SAC ¶¶127, 148.) Plaintiffs' allegations thus boil down to the claim that the use and enforcement of a common agreement among limited partners requires market power; this position runs counter to common sense and has no precedential support.

### (ii)    Actual Detrimental Effects

Plaintiffs also fail to carry their burden by alleging "proof of actual detrimental effects, such as reduced output, increased prices, or decreased quality in the relevant market." *Am. Express Co.*, 585 U.S. at 542 (cleaned up).  Such showings are demanding and uncommon. *See Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*, 833 F.3d 399, 403 (3d Cir. 2016) ("We have noted that 'the difficulty of isolating the market effects of the challenged conduct' means proof of 'actual anticompetitive effects, as opposed to market power, is often impossible to make.'") (cleaned up).

Plaintiffs allege no *facts* suggesting that these agreements have caused any of these effects on a market-wide basis. *Am. Express Co.*, 585 U.S. at 542. Instead, Plaintiffs allege three supposed anticompetitive effects that are factually unsupported and legally deficient.  (SAC ¶179.)

The first, lower wages for Defendants' employees, is not even allegedly a market-wide impact.  "The antitrust laws were not designed to protect every uncompetitive activity, but rather only those activities that have anti-competitive effects on the market as a whole." *Eichorn*, 248 F.3d at 148.  That Defendants' limited partners allegedly make less money than they might otherwise is simply not a market-wide effect.

The other two alleged anticompetitive effects—conclusory assertions of restrictions of employees available to competitors and increased recruiting costs faced by competitors—are consequences of all employment contracts. Whenever an employer signs an employee to a term contract, it prevents competitors from hiring that employee. And the provision of any form of compensation—whether a salary, a contingent right to payment, or generous health insurance—makes it more expensive for competitors to hire employees away. But the process by which one employer's practices increase costs to other employers is the proper functioning of the labor market, not an anticompetitive effect thereon.

Plaintiffs' conclusory allegations about restrictive covenants generally fall far short of pleading a "substantial anticompetitive effect," on a market-wide basis. *Am. Express Co.*, 585 U.S. 542; *see also Deborah Heart & Lung Ctr.*, 833 F.3d at 403 (Section 1 claims fail where "plaintiff shows effects only on a small subset of [the] market and makes no attempt to show broader effects").

### D. Plaintiffs' Sherman Act Claims Are Untimely.

Plaintiffs' Sherman Act claims are barred by the Act's four-year statute of limitations. *See* 15 U.S.C. §15(b). A Sherman Act claim accrues when "a defendant commits an act that injures a plaintiff's business," including damages which a plaintiff "will suffer in the future from the particular invasion." *Zenith Radio Corp. v. Hazeltine Rsch.*, 401 U.S. 321, 338-39 (1971).

Here, Plaintiffs agreed to the relevant contractual conditions prior to 2019. (SAC ¶¶18-24.) Any supposed injury to competition from the Agreements occurred more than four years ago, when Defendants supposedly exerted market power to impose these provisions.

## II. PLAINTIFFS' DECLARATORY JUDGMENT CLAIM IS DEFICIENT AND DUPLICATIVE

Plaintiffs also seek a declaratory judgment that the Agreements violate the Sherman Act. This claim should be dismissed, because, as explained above, Plaintiffs fail to allege a Sherman Act claim. It should separately be dismissed because Plaintiffs have already brought all conceivable coercive claims concerning the Sherman Act and these contract provisions, so a declaratory judgment claim would be duplicative. *See Butta v. GEICO Casualty Co.*, 400 F. Supp. 3d 225, 231 (E.D. Pa. 2019).

## III. PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS

Because Plaintiffs' antitrust claim fails, the breach of contract claim also fails. The Court can and should stop there. But, even if Plaintiffs had successfully alleged an antitrust claim, Plaintiffs fail to allege a breach of contract claim because Defendants applied the contracts according to their terms, in precisely the manner endorsed by the Delaware Supreme Court.

The Delaware Supreme Court could not have been clearer: the challenged provisions are "condition[s] precedent that excuse[] Cantor Fitzgerald from its duty

to pay if the plaintiffs fail to satisfy the condition[s] to which they agreed to be bound in order to receive a deferred financial benefit." *Ainslie*, 2024 WL 315193, at 9. The Competitive Activity Condition and the No Breach Condition are disjunctive conditions precedent, "such that the failure of either relieves Cantor Fitzgerald of its duty to pay." *Id.* at *8. Plaintiffs never allege they satisfied these conditions and admit in several instances that they engaged in Competitive Activity. (*See, e.g.*, SAC ¶¶98-99, 200). Under the Delaware Supreme Court's holding, Defendants were never obligated to pay, and non-payment cannot constitute breach.

Plaintiff's argument—that this Court should ignore *Ainslie* and find a breach because enforcement of the contract as written was supposedly anticompetitive— ignores the Delaware Supreme Court's holding that these provisions "do[] not restrict competition." *Ainslie*, 2024 WL 315193, at *11. This holding should be persuasive regarding the federal antitrust claims, but it is certainly dispositive with regard to Delaware law contract claims.[11]

---

[11] Moreover, even if the Conditioned Payment provisions violate the Sherman Act (which they do not), that would only mean that Plaintiffs could recover damages for their antitrust injury (which they have not suffered), not that they can revive their right to contractual payments the Delaware Supreme Court has said are not due.

## IV.   PLAINTIFFS MCLOUGHLIN AND SOFOCLEOUS FAIL TO ALLEGE A VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

Plaintiffs McLoughlin and Sofocleous newly allege individualized, alternative claims for supposed violations of the covenant of good faith and fair dealing.  These claims fail under Delaware law.

A claim for violation of the covenant of good faith and fair dealing in the context of a partnership agreement requires an allegation of subjective bad faith. *Exit Strategy, LLC v. Festival Retail Fund BH, L.P.,* No. 2017-0017-NAC, 2023 WL 4571932, at *9 (Del. Ch. July 17, 2023).  A determination is in good faith unless it is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any grounds other than bad faith."  *DV Realty Advisors LLC v. Policemen's Annuity & Ben. Fund of Chicago*, 75 A.3d 101, 110 (Del. 2013); *see also Cantor Fitzgerald, L.P. v. David Demos*, 2019-0193, C.A. No. 86156868, at 22:7-10 (Del. Ch. Apr. 28, 2020) (granting summary judgment dismissing an implied covenant claim under the CFLP partnership agreement because at least one explicable reasonable other than bad faith was evident) (Ex. 1).

Here, Defendants' good faith reason for denying payment of the conditioned amounts under the Agreements is obvious on the face of the SAC: Plaintiffs' *prima facie* failure to satisfy the conditions precedent to payment.  Indeed, McLoughlin

and Sofocleous each admit that they engaged in competing employment.  (*See* SAC ¶¶98, 199.)  Defendants therefore clearly had good-faith reasons to conclude that the conditions to payment were not satisfied.

## V.     THE SEPARATION AGREEMENTS ADDITIONALLY BAR SOME PLAINTIFFS' CLAIMS

### A.     Plaintiffs McLoughlin's and Miller's Claims Are Time-Barred.

The BGC and Newmark partnership units held by McLoughlin and Miller were redeemed following their separations in 2020 and 2021, respectively, and each agreed to certain conditions in exchange for conditional payments.  (SAC ¶¶74-76.)  These conditions included a one-year limitations period.

McLoughlin and Miller each agreed that they may not "institute any action challenging, directly or indirectly, the terms, conditions or validity or any other matter related to or arising out of any redemption by the Partnership of Units…held by such Partner, whether such action is based (in whole or in part) in contract, tort and/or any duty otherwise existing in law or equity," unless the action were "instituted on or prior to the first anniversary" of the redemption.  (SAC ¶79.) Plaintiffs McLoughlin and Miller now challenge the "validity" of the provisions of the contract that effectuated the "redemption" of their units.  (SAC ¶80.)  The one-year limitations period began to run upon the execution of those agreements in 2020 and 2021, respectively.  This contractually shortened limitations period is

enforceable under Delaware law.  *Mark DutchCo 1 B.V. v. Zeta Interactive Corp.*, 411 F. Supp. 3d 316, 332 (D. Del. 2019).

Plaintiffs are wrong to suggest that this time-bar would preclude them from ever bringing their antitrust claims.  (SAC ¶¶83-87.)  Plaintiffs could have challenged these provisions as soon as Defendants supposedly exerted market power to impose them.  All facts related to that claim were known within one year of the redemption—before any payment became due.

## B. Plaintiffs McLoughlin, Miller, and Sofocleous Released Their Claims.

The Separation Agreements signed by McLoughlin, Miller, and Sofocleous each released all claims against Defendants, including BGC and Newmark, as to "any matter whatsoever."  (D.I. 26-1-26-5 §5.)  For this additional reason, the claims of these three Plaintiffs should be dismissed.

## C. The Other Plaintiffs Do Not State Any Claim Against BGC or Newmark.

Apart from McLoughlin and Miller, none of the other Plaintiffs allege that they had any relationship with BGC or Newmark.  The other Plaintiffs could not possibly have been harmed by any anticompetitive activity by BGC in the supposed IBD Labor Market, as they never worked in that alleged market.  For this reason as well, BGC and Newmark should be dismissed from the lawsuit.

## CONCLUSION

The Second Amended Complaint should be dismissed with prejudice.

Dated: March 22, 2024

CANTOR FITZGERALD
David A. Paul
Mitchell Nobel
110 E. 59th Street, 7th Floor
New York, New York 10022
(212) 610-2298
dpaul@cantor.com
mitchell.nobel@cantor.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Anne Shea Gaza*
C. Barr Flinn (No. 4092)
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
bflinn@ycst.com
rvrana@ycst.com

SIDLEY AUSTIN LLP
Benjamin R. Nagin
Eric G. Hoffman
787 Seventh Avenue
New York, NY 10019
(212) 839 5911
bnagin@sidley.com

Tacy F. Flint
Frank J. Favia, Jr.
One South Dearborn
Chicago, IL 60603
(312) 853 7875
tflint@sidley.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHAWN MCLOUGHLIN, ROBERT MILLER, ANGELO SOFOCLEUS, ANDREW LEWIS, CHEYNE BUNNETT, TOM ROBERTSHAW, and OLIVIA SCOTT (as the personal representative of the ESTATE OF RUSSELL SCOTT), <br><br> Plaintiffs, <br><br> v. <br><br> CANTOR FITZGERALD, L.P., BGC HOLDINGS, L.P., and NEWMARK HOLDINGS, L.P. <br><br> Defendants. | C.A. No. 23-cv-256-CFC |

## CERTIFICATION OF COMPLIANCE

The undersigned certifies that Defendants' Opening Brief in Support of Their Motion to Dismiss is in Times New Roman 14-point font and contains 4995 words, exclusive of caption, tables, and signature block, counted using Microsoft Word's word count feature.

Dated: March 22, 2024

CANTOR FITZGERALD
David A. Paul
Mitchell Nobel
110 E. 59th Street, 7th Floor

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Anne Shea Gaza*

New York, New York 10022
(212) 610-2298
dpaul@cantor.com
mitchell.nobel@cantor.com

C. Barr Flinn (No. 4092)
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
bflinn@ycst.com
rvrana@ycst.com

SIDLEY AUSTIN LLP
Benjamin R. Nagin
Eric G. Hoffman
787 Seventh Avenue
New York, NY 10019
(212) 839 5911
bnagin@sidley.com

Tacy F. Flint
Frank J. Favia, Jr.
One South Dearborn
Chicago, IL 60603
(312) 853 7875
tflint@sidley.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 22, 2024, a copy of the
foregoing document was served on the counsel listed below in the manner
indicated:

**<u>BY EMAIL</u>**

Blake A. Bennett
COOCH & TAYLOR P.A.
The Brandywine Building
1000 N. West Street, Suite 1500
Wilmington, DE 19801
bbennett@coochtaylor.com

Velvel Freedman
FREEDMAN NORMAND
FRIEDLAND LLP
1 SE 3rd Ave., Suite 1240
Miami, FL 33131
vel@fnf.law

Kyle W. Roche
KYLE ROCHE P.A.
260 Madison Avenue, 8th Fl.
New York, NY 10016
kyle@kyleroche.law

Amos Friedland
Alex Potter
Stephen Lagos
FREEDMAN NORMAND
FRIEDLAND LLP
99 Park Avenue, Suite 1910
New York, NY 10016
afriedland@fnf.law
apotter@fnf.law
slagos@fnf.law

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Anne Shea Gaza*
C. Barr Flinn (No. 4092)
Anne Shea Gaza (No. 4093)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
bflinn@ycst.com
agaza@ycst.com

rvrana@ycst.com

*Attorneys for Defendants*

# EXHIBIT 1

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

```
CANTOR FITZGERALD, L.P.,            :
                                    :
            Plaintiff,              :
                                    :
      v                             :   Civil Action
                                    :   No. 2019-0193-MTZ
DAVID DEMOS,                        :
                                    :
            Defendant.              :
```

- - -

Chancery Court Chambers
Leonard L. Williams Justice Center
500 North King Street
Wilmington, Delaware
Tuesday, April 28, 2020
11:01 a.m.

- - -

BEFORE:  HON. MORGAN T. ZURN, Vice Chancellor.

- - -

TELEPHONIC RULINGS OF THE COURT ON PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT

- - -

------------------------------------------------------------
CHANCERY COURT REPORTERS
Leonard L. Williams Justice Center
500 North King Street - Suite 11400
Wilmington, Delaware 19801
(302) 255-0524

2

```
1    APPEARANCES:   (via telephone)

2         PAUL J. LOUGHMAN, ESQ.
          C. BARR FLINN, ESQ.
3         Young, Conaway, Stargatt & Taylor LLP
               -and-
4         DAVID A. PAUL, ESQ.
          PHILIP H. KIM, ESQ.
5         Assistance General Counsels
          Cantor Fitzgerald
6           for Plaintiff

7         RICHARD M. BECK, ESQ.
          Klehr, Harrison, Harvey, Branzburg LLP
8           for Defendant

9                             -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

CHANCERY COURT REPORTERS

3

1          THE COURT:  Good morning, everyone.
2  This is Morgan Zurn.  Thanks for your patience.  I had
3  some technical difficulties.
4          Could I get appearances, please,
5  beginning with counsel for plaintiff?
6          MR. LOUGHMAN:  Good morning, Your
7  Honor.  This is Paul Loughman from Young Conaway on
8  behalf of Cantor Fitzgerald.  Also on the line from
9  Young Conaway is Barr Flinn; and from Cantor
10  Fitzgerald, David Paul, Philip Kim.
11          THE COURT:  Good morning.
12          UNIDENTIFIED SPEAKER:  Good morning,
13  Your Honor.
14          MR. BECK:  Good morning, Your Honor.
15          Good morning, Your Honor.  Richard
16  Beck from Klehr Harrison Harvey Branzburg.  On the
17  phone is my cocounsel, Carine Williams.  In addition,
18  there are three spectators who are also dialed in, who
19  I'd be happy to introduce, if you'd like.
20          THE COURT:  Please.
21          MR. BECK:  David Demos, our client;
22  Ronald Sullivan; and Jasmine Randt.
23          THE COURT:  Thank you.
24          And do we have a court reporter --

CHANCERY COURT REPORTERS

4

1                    MR. BECK:  They will not be speaking.

2    Thank you.

3                    THE COURT:  Thank you.

4                    THE COURT REPORTER:  Yes, you do.

5    Good morning, Your Honor.  It's Neith.

6                    THE COURT:  Good morning, Neith.

7                    And, Lauren, are you on?

8                    THE COURT CLERK:  I am on the line.

9                    THE COURT:  Thank you.

10                    Thanks, everyone, for getting on the

11   line.  The world has changed fairly dramatically since

12   last we met.  So I appreciate your patience as I put

13   together my thoughts on this issue.  I have a fairly

14   lengthy bench ruling to read, so I would appreciate it

15   if everyone would mute their line, and I'll try to

16   speak up.

17                    With that, in this action, I consider

18   whether the partnership agreement at issue entitles

19   the defendant, David Demos, to indemnification for

20   legal fees incurred in defending criminal charges

21   against him for federal securities fraud.  Today I

22   will grant the plaintiff's motion for summary judgment

23   for the following reasons.  I will begin with a brief

24   overview of the facts as I find them, supported by the

5

1    record, and of the procedural history of the case.

2              Defendant Demos was formerly employed

3    as a mortgage bond trader by nonparty Cantor

4    Fitzgerald & Co., which I will refer to as the

5    "Company."  The Company is a FINRA-registered

6    broker-dealer and affiliate of plaintiff Cantor

7    Fitzgerald, L.P.  Plaintiff Cantor Fitzgerald, L.P. is

8    a Delaware limited partnership.  I refer to plaintiff

9    as "Cantor" or the "Partnership."  The Partnership's

10   managing general partner is CF Group Management, Inc.,

11   a New York corporation, which I refer to as the "MGP."

12   During his employment with Cantor Fitzgerald & Co.,

13   Demos was also a limited partner of the Partnership

14   pursuant to the terms of the agreement of limited

15   partnership of Cantor Fitzgerald, L.P.  I refer to

16   this document as the "Agreement."

17             Demos admittedly engaged in

18   unscrupulous conduct while brokering residential

19   mortgage-backed securities, or RMBS.  RMBSs are not

20   publicly traded.  So buyers and sellers rely on

21   broker-dealers and traders to communicate and

22   understand the transaction.  Demos admits that he made

23   representations to customers about the prices at which

24   counterparties to RMBS transactions were offering to

1   sell or purchase the securities.

2            Because of this misconduct, Demos was

3   indicted for federal securities fraud.  In his

4   criminal case, Demos admitted that he misrepresented

5   the price at which he purchased bonds.  Written chat

6   communications show that Demos lied to customers about

7   pricing.  Demos doctored quotes from selling customers

8   and used them in communications with buyers.  When

9   communicating the seller's position to the buyer,

10  Demos misquoted the price at which the selling

11  customer was willing to close the transaction.  Once

12  the transaction closed, Demos profited from the

13  misrepresentation.  And Demos made and profited from

14  similar misrepresentations to sellers.  For example,

15  after learning that the buyer had room to go higher,

16  Demos would misrepresent to the seller that the buyer

17  could not close at a higher price.  Demos bought from

18  the seller at lower price, despite knowing that

19  transaction should have closed at a higher price.  He

20  would then flip the security and profit.

21            In December 2013, after Demos'

22  employment ended, the Company learned of his

23  misconduct through an SEC inquiry.  The SEC and

24  Department of Justice conducted an extensive

7

1    investigation that the Company endured at a

2    significant cost.  Because Demos was a limited partner

3    of the Partnership, the investigation, and ultimately

4    the criminal charges, implicated the terms of the

5    Agreement.  Demos' actions also implicated the

6    Company's policies and procedures that require a

7    broker-dealer to communicate with clients in a manner

8    that is honest and is not misleading or deceptive.  I

9    refer to those as the "Company Policies."

10                    In the course of the investigation,

11   the MGP determined that Demos had engaged in willful

12   misconduct and violated the Company Policies, as

13   evidenced by his written communications and his own

14   admissions in the criminal case.  The MGP also

15   determined that Demos' misrepresentations to customers

16   reasonably could be expected to harm and did in fact

17   harm the Company in a number of ways.  These included

18   causing a loss of existing business and a decrease in

19   new business and harm to the Company's reputation.

20                    In May 2016, Demos requested, pursuant

21   to the Agreement, that Cantor advance him expenses

22   incurred in his criminal case.  Cantor declined, and

23   on December 5th, Demos filed an arbitration with FINRA

24   in an attempt to force advancement by Cantor.  On

8

1     December 7th, Demos was indicted on six counts of

2     federal securities fraud.

3                In February 2018, FINRA denied Demos'

4     request for indemnification and advancement in their

5     entirety.  And on May 3rd, Demos was acquitted.  On

6     May 22nd, Demos again requested indemnification and

7     advancement for defending the criminal case, arguing

8     that because of the acquittal, Cantor can no longer

9     cite the nature of the allegations against Demos as

10    grounds for denying the request.  Cantor denied the

11    request on May 29th, citing Demos' willful misconduct

12    and violation of the Company Policies.  Cantor stated

13    that it is not the nature of the allegations that bars

14    indemnification but, rather, Demos' conduct.

15    Importantly, Demos' counsel agreed with that

16    characterization in October 2010.  Further, the MGP

17    determined that acquittal did not affect its

18    determination that Demos was not entitled to

19    indemnification under the Agreement, as Demos' defense

20    was primarily based on materiality rather than a

21    flat-out denial of misconduct.

22                Cantor initiated this action on

23    March 8th, 2019, and filed its amended complaint on

24    July 3rd.  Demos filed his answer and counterclaims on

9

1    July 19th.  On September 27th, Cantor moved for

2    summary judgment on its sole count in the amended

3    complaint, which seeks a declaratory judgment that

4    Demos is not entitled to indemnification.  Cantor also

5    moved for summary judgment on all counts of Demos'

6    counterclaim, including claims for breach of contract,

7    promissory estoppel, indemnification, and breach of

8    the implied covenant of good faith and fair dealing.

9    The parties fully briefed the motion as of

10   January 14th, 2020, and I heard oral argument on

11   January 21st.

12           Summary judgment is appropriate where

13   there is no genuine issue of material fact and the

14   moving party is entitled to judgment as a matter of

15   law.  Under Delaware law, if one movant puts in the

16   record facts which, if undenied, entitle him to

17   summary judgment, the burden shifts to the opposing

18   party to dispute the facts by affidavit or proof of

19   similar weight.  The nonmoving party must come forward

20   with admissible evidence creating a triable issue of

21   material fact.

22           The Delaware Revised Uniform Limited

23   Partnership Act gives maximum effect to freedom of

24   contract.  "[B]y statute, the parties to a Delaware

10

1    limited partnership have the power and discretion to

2    form and operate a limited partnership in an

3    environment of private ordering according to the

4    provisions in the limited partnership agreement."

5    That's a quote from *Gotham Partners*.   Under

6    Section 17-108 of the Act, the parties to the limited

7    partnership agreement enjoy broad authority in setting

8    their indemnification provisions.   The statutory

9    language is permissive and does not create a per se

10   right to indemnification.   In fact, "Section 17-108

11   defers completely to the contracting parties to create

12   and delimit rights and obligations with respect to

13   indemnification and advancement."   That's a quote from

14   *Weil versus VEREIT Operating Partnership*.   The terms

15   of the limited partnership agreement control.

16                    Thus, as this Court opined in *Morgan v*

17   *Grace*, summary judgment is particularly appropriate in

18   advancement and indemnification disputes under limited

19   partnership agreements because "the relevant question

20   turns on the application of the terms of the [limited

21   partnership agreement] setting forth the purported

22   right to [indemnification] and the pleadings in the

23   proceeding for which [indemnification] is sought."

24   Looking to the terms of the Partnership Agreement in

11

1  this case, I conclude that summary judgment in

2  Cantor's favor is appropriate.

3            As Demos agrees, his claim for

4  indemnification is governed by contract:

5  specifically, Section 9.05 of the Agreement.

6  Section 9.05 is highly protective of the Partnership.

7  It shields the Partnership from having to indemnify

8  persons whose misconduct harms or reasonably could be

9  expected to harm the Partnership and its affiliates.

10 Under applicable law, this Court enforces such

11 contractual indemnification provisions to the maximum

12 extent of their terms.

13            In relevant part, Section 9.05 states:

14 "The Partnership shall indemnify ... the Limited

15 Partners ... from and against any loss, damage,

16 liability, cost or expense ... to which the

17 Indemnified Person may become subject arising out of

18 or in connection with the authorized business and

19 operation of the Partnership or any Affiliated Entity,

20 except that the Partnership shall not identify any

21 Indemnified Person for any loss, damage, liability,

22 cost or expense unless the Managing General Partner

23 determines otherwise in its sole and absolute

24 discretion ...."

12

1               And then (iii) excludes

2    indemnification where the loss is "arising from any

3    act or omission that in the opinion of the Managing

4    General Partner is a material breach of this Agreement

5    (whether or not a court of competent jurisdiction

6    determines that such act or omission was or was not

7    such a breach) or ... or willful misconduct or any

8    violation of any policy or procedure of the

9    Partnership or any Affiliated Entity ...."

10              Of importance here, Section 3.05 of

11   the Agreement burdens Demos with certain "Partner

12   Obligations."  That section provides:  "Each Limited

13   Partner agrees that, in addition to any other

14   obligations that he, she or it may have under this

15   Agreement, he ... shall have a duty of loyalty to the

16   Partnership and further agrees during the Restricted

17   Period not to, either directly or indirectly ... take

18   any action to harm, that harms, or that reasonably

19   could be expected to harm, the Partnership or any

20   Affiliated Entity, including, without limitation, any

21   breach ... of Section 8.06.  The determination of

22   whether a Limited Partner has breached its Partner

23   Obligations will be made in good faith by the Managing

24   General Partner in its sole and absolute discretion,

13

1 | which determination will be final and binding."

2 |                 Cantor argues that Demos' request for

3 | indemnification under Section 9.05 of the Agreement is

4 | barred for two reasons:  Demos materially breached the

5 | Agreement under Section 3.05 and also violated the

6 | Company Policies.  First, Cantor contends that there

7 | is no genuine dispute that at least one explanation,

8 | other than bad faith, exists for the MGP's

9 | determination that Demos materially breached the

10 | Agreement, and that therefore the MGP acted in good

11 | faith when opining that Demos breached Section 3.05.

12 | Second, Cantor contends that there is no genuine

13 | dispute that Demos violated the Company Policies.

14 |                 Either of these theories, if supported

15 | by the record, is sufficient to bar Demos'

16 | indemnification claims.  I conclude that the record

17 | submitted supports Cantor's argument that

18 | Section 9.05's "material breach" provision precludes

19 | indemnification.  Therefore, my analysis focuses

20 | solely on those grounds for denial, and I do not reach

21 | the question of whether Demos' indemnification request

22 | must be denied based on violations of Cantor's

23 | policies.

24 |                 Demos does not dispute that, as a

14

1    limited partner, he was required under Section 3.05 to

2    refrain from undertaking any act that would harm or

3    that could be reasonably expected to harm Cantor.  Nor

4    does Demos dispute that, in the opinion of the MGP,

5    Demos' lies to customers about the pricing of RMBS,

6    harmed or reasonably could be expected to harm Cantor.

7    Instead, Demos argues that Section 9.05 is ambiguous

8    and asserts a number of arguments that he believes

9    create a triable issue of material fact that precludes

10   summary judgment.

11                   As an initial matter, the language of

12   Section 9.05 is clear and unambiguous, and the MGP's

13   determination complies fully with the language of the

14   Agreement.  Section 9.05 mandates that Cantor

15   indemnify persons such as Demos unless an enumerated

16   exception applies.  That section unambiguously

17   precludes indemnification if the subject loss, cost,

18   or expense is subject to any of the enumerated

19   disqualifying circumstances.  One disqualifying

20   circumstance is if the subject loss ... arises from

21   any act that "in the opinion of the Managing General

22   Partner is a material breach of th[e] Agreement

23   (whether or not a court determines that such act was

24   or was not a material breach) ...."  This reading is

15

1   consistent with *Stockman versus Heartland Industries*

2   and *Council of Dorset Condominium Apartments versus*

3   *Gordon*.

4               But Section 9.05 has an additional

5   layer.  If a disqualifying circumstance applies, then

6   the MGP may exercise its discretion to override the

7   disqualification.  Under the plain terms of Section

8   9.05, the MGP retains "sole and absolute discretion"

9   to grant indemnification even if a disqualifying

10  circumstance is otherwise applicable.  The MGP does

11  not have discretion to deny indemnification that is

12  otherwise required.

13              A holistic reading of Section 9.05

14  supports this interpretation.  The phrase "unless the

15  Managing General Partner determines otherwise in its

16  sole and absolute discretion" modifies the phrase

17  "except that the Partnership shall not indemnify."

18  The phrase granting the MGP discretion immediately

19  precedes and introduces the enumerated disqualifying

20  circumstances.  But the phrase does not grant the MGP

21  sole discretion to determine whether a circumstance

22  precludes indemnification.  If a disqualifying

23  circumstance precludes indemnification, then the MGP

24  may, in its sole and absolute discretion, decide to

16

1  override the disqualifying circumstance and grant

2  indemnification.

3          Consistent with *Miller versus*

4  *Palladium Industries*, this reading gives full effect

5  to Section 9.05's use of "unless" and "except," and

6  signals that indemnification is mandatory except when

7  an enumerated ground applies to preclude an

8  indemnification request, unless the MGP decides to

9  grant indemnification anyway.

10         Demos contends that Section 9.05

11  contains a nexus requirement by which the loss at

12  issue must result from the material breach of the

13  Agreement or Company Policy giving rise to the

14  exclusion from indemnification in order for the loss

15  to be excluded.  Demos' legal fees resulted from his

16  criminal charges, not a breach of the Agreement.  And

17  so he contends his losses from those charges cannot be

18  excluded, even if the conduct underlying the criminal

19  charges is a breach of the Agreement.

20         I do not read the plain language of

21  Section 9.05 to work this way.  To qualify for

22  indemnification, the loss must "aris[e] out of or in

23  connection with the authorized business and operation

24  of the Partnership or any Affiliated Entity" to

17

1    qualify for indemnification.  That is the only "nexus"
2    requirement for losses, costs, and expenses under
3    Section 9.05.  That requirement is indisputably
4    satisfied here, where Demos' criminal proceedings and
5    associated legal fees resulted from his brokering
6    misconduct.
7              The exclusions to indemnification are
8    based not on the source of the loss but on the
9    character of the act or omission from which the loss
10   arises.  An act or omission that violates the
11   Company's Agreement or policy is excluded.
12   Indemnification is precluded if that act or omission
13   that created the loss, "in the opinion of the [MGP] is
14   a material breach of [the] Agreement" or "any
15   violation of any policy or procedure [of the
16   Company]."  The fact that the loss arose out of a
17   different legal framework rather than out of that
18   breach or violation is of no moment.  The
19   disqualifying circumstance is that the act or omission
20   is a breach, not that the loss arises from the breach.
21   Here, the losses Demos incurred as a result of his
22   criminal proceedings arise from the same acts or
23   omissions that the MGP determined also constitutes a
24   material breach of the Agreement.

18

1          I turn now to the plain meaning of the

2   exclusion based on the character of Demos' acts.

3   Section 9.05(iii) unambiguously precludes

4   indemnification when, in the "opinion of the Managing

5   General Partner," the limited partner has committed a

6   material breach of the Agreement.  The Agreement's

7   plain language allows the MGP to determine whether

8   there has been a material breach.  The MGP's opinion

9   is binding "whether or not a court of competent

10  jurisdiction determines that such act or omission was

11  or was not a breach."  Section 9.05 does not require

12  that the MGP's opinion that there's been a breach or

13  that the breach is "material" be correct.  This is the

14  only reasonable interpretation of Section 9.05.

15          Cantor stands behind the MGP's

16  determination that Demos breached Section 3.05(a)(iv)

17  of the Agreement.  That section prohibits a limited

18  partner from taking "any action to harm, that harms,

19  or could harm or that reasonably could be expected to

20  harm, the Partnership or any Affiliated Entity ...."

21  That section further provides that "The determination

22  of whether a Limited Partner has breached its Partner

23  Obligations will be made in good faith by the Managing

24  General Partner in its sole and absolute discretion,

19

1  which determination will be final and binding."

2          Thus, if the MGP determines that the

3  limited partner has taken any action that harms or

4  could reasonably be expected to harm Cantor, in its

5  sole and absolute discretion as bounded by a good

6  faith requirement, then the MGP may opine that there

7  has been a material breach under Section 9.05 that

8  precludes indemnification.  Even if the MGP is wrong

9  and Demos' conduct did not harm or could not

10 reasonably be expected to harm Cantor, the managing

11 general partner's good faith decision is "final and

12 binding."

13          Having parsed the contractual

14 language, the next question is whether Demos has

15 raised a genuine dispute as to whether the MGP

16 determined that Demos materially breached

17 Section 3.05(a)(iv) in good faith.  I determine that

18 Demos has not raised a dispute sufficient to preclude

19 summary judgment against him.

20          As this Court signaled in *Gotham*

21 *Partners versus Hallwood Realty* and other cases, where

22 a limited partnership agreement provides a general

23 partner with "sole and [absolute]" discretion, the

24 Court declines to second-guess the general partner's

20

determination.  This principle is "in keeping with a contractual expectation on the part of the General Partner that it would have substantial authority to maintain its position, subject only to such constraints as are imposed by the contract itself." That's a quote from *Gotham Partners*.

Here, the contract imposes the constraint of good faith without defining what that means.  The Delaware Supreme Court in *DV Realty Advisors* has held that where a limited partnership agreement expressly imposes a good faith standard on an actor's determination, but does not define good faith, a determination is in good faith unless it is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any grounds other than bad faith."

This Court applied that standard recently in *CelestialRX Investments versus Krivulka*. "[A] conclusion of good faith involves a mixed question of law and fact.  The ultimate determination that a party acted in good faith is a legal issue." That's another instruction from *DV Realty*.  Therefore, when the facts are undisputed, the Court may apply the *DV Realty* standard to determine good faith as a matter

21

1  of law.  This Court did so in *In re Alloy*, dismissing
2  claims where the Court could not find that the actions
3  were "so far beyond the bounds of reasonable judgment
4  that it seems essentially inexplicable on any ground
5  other than bad faith."  It also did so in *In re*
6  *MeadWestvaco Stockholders Litigation*, dismissing
7  claims and stating that "even one plausible and
8  legitimate explanation for the board's decision would
9  negate a reasonable inference that the decision was so
10  far beyond the bounds of reasonable judgment that it
11  seems essentially inexplicable on any ground other
12  than bad faith."
13            In *DV Realty*, the Delaware Supreme
14  Court expressly stated that good faith is a subjective
15  standard.  In *Dole Foods*, our Court stated that the
16  reasons supporting a determination under a good faith
17  provision cannot be pretextual, meaning that the
18  reasons offered are not genuine.  Synthesizing the
19  "good faith" standard and prohibition on pretext, I
20  conclude that even if the MGP held an alleged "bad
21  faith" reason for finding a breach of Section 3.05, as
22  long as the MGP also held a genuine and undisputed
23  good faith reason for finding a breach, then a pretext
24  argument could not preclude a conclusion that the MGP

22

1   acted in good faith.

2          Demos contends that the MGP's offered

3   reasons for determining he breached Section 3.05 are

4   pretextual, and that summary judgment should be denied

5   so that he can conduct discovery into that pretext.

6   Under the good faith standard as I just articulated

7   it, Cantor's motion turns on whether Cantor has

8   offered evidence supporting at least one explicable

9   reason, other than bad faith, for the MGP's

10  determination.  I conclude that Cantor has done so.

11         The MGP determined that Demos breached

12  Section 3.05 by lying to Cantor's customers.  Although

13  Demos' actions may have financially benefited Cantor

14  in the short term, Cantor has offered and supported a

15  list of long-term harms that resulted or could

16  reasonably be expected to result from Demos' behavior,

17  supporting a good faith determination that Demos

18  breached Section 3.05.

19         The first expected suffered harm to

20  Cantor is a loss of existing business and a decrease

21  in new business.  Demos' own counterclaims state that

22  one of Cantor's customers "complained to CFLP and/or

23  its affiliates that inaccurate price information had

24  been shared by Mr. Demos in negotiations over an RMBS

23

1  deal" and that the customer "advised CFLP and/or

2  affiliates that it intended to suspend business

3  transactions for some defined period of time as a

4  consequence."  That's from counterclaim paragraph 50.

5            The second expected and actualized

6  harm was to Cantor's reputation.  Following Demos'

7  indictment, his acts of dishonesty were widely

8  publicized, with articles appearing in widely

9  circulated news publications including *The Wall Street*

10 *Journal*, *Bloomberg*, *Fortune*, and *Reuters*.  Those

11 articles were submitted as exhibits in support of

12 Cantor's motion.

13           Demos' representations caused a third

14 expected and actualized harm to Cantor by causing it

15 to settle claims with customers.  Demos does not rebut

16 this claim.

17           Fourth, Demos' actions required Cantor

18 to bear the significant costs of responding to the SEC

19 and DOJ inquiries.  Cantor's response to the inquiries

20 included, but was not limited to, conducting a robust

21 internal investigation, retaining outside counsel, and

22 making copious document productions to the SEC and

23 DOJ.  Demos does not rebut this claim.

24           Demos does not meaningfully dispute

24

1    Cantor's four sources of expected or actual harm.  He

2    does not dispute that he lied to Cantor's customers

3    concerning the RMBS transactions, and he has conceded

4    that in his filings in this case and his criminal

5    case.  The record Cantor submits also supports the

6    conclusion that Demos misled Cantor's customers,

7    including the chat communications.

8                    Rather, Demos argues that the MGP's

9    determination under Section 3.05 based on Cantor's

10   demonstrated harm is pretextual.  Demos alleges the

11   MGP acted in bad faith by withholding indemnification

12   from him in order for Cantor "to curry favor with

13   federal prosecutors who may have been investigating

14   both entities for securities violations, including

15   failure to train and supervise."  That's from his

16   answering brief at page 33, citing paragraph 82 of his

17   counterclaim.

18                    As discussed above, the undisputed

19   record supports a finding that the MGP had at least

20   four grounds for finding a breach of Section 3.05.

21   The MGP only needed one genuine and undisputed good

22   faith reason for finding a breach for me to conclude

23   that the MGP's determination was in good faith, so

24   long as it is not "so far beyond the bounds of

25

1   reasonable judgment that it seems essentially

2   inexplicable on any grounds other than bad faith."  On

3   that basis alone, even assuming Demos could prove that

4   pretextual reason, Demos' pretext argument fails on

5   summary judgment.

6          Demos' allegations of pretext are

7   extremely thin.  He offered no facts in support other

8   than a chronology of Cantor explaining the rationale

9   for denying indemnification.  And Demos has submitted

10   no evidence in support of his pretext theory.  Rather,

11   Demos submitted an affidavit under Rule 56(f)

12   contending he needs to take discovery into the factual

13   basis for how Cantor made the decision not to

14   indemnify Mr. Demos.

15          Rule 56(f) permits (but does not

16   require) the Court to deny summary judgment "when it

17   appear[s] from the affidavits of a party opposing the

18   motion that the party cannot for the reasons stated

19   present by affidavit facts essential to justify the

20   party's opposition."  The Court may grant summary

21   judgment in the face of a Rule 56(f) affidavit where

22   the movant would be entitled to judgment as a matter

23   of law even if the nonmovant had the opportunity to

24   develop the evidentiary record, as in *Shenandoah Life*

26

1   *Insurance Company versus Valero Energy Corp.*

2                    I decline to permit Demos to seek

3   discovery into this issue.  Even if he could prove it,

4   Demos' theory of pretext cannot rebut the

5   determination that the MGP acted in good faith.  In

6   the face of sufficient and undisputed good faith

7   reasons, Demos cannot as a matter of law prove

8   pretext.

9                    He must also attempt to create a

10  triable issue of material fact by pointing to a number

11  of factual issues that have no bearing on the MGP's

12  good faith exercise of its discretion.  Demos contends

13  that a fact finder could consider several pieces of

14  evidence that the MGP did not act in good faith.

15                   First, Demos argues that whether he

16  acted with any reasonable expectation that his conduct

17  could materially harm Cantor is an issue of fact that

18  warrants denial of summary judgment.  Demos looks to

19  the underlying criminal trial record and SEC no-action

20  letter as dispositive proof that he did not act with

21  intent to make material misrepresentations.

22                   But Demos' intent or expectations in

23  causing harm are irrelevant under Section 3.05.  That

24  section has no intent or *scienter* requirement, nor

27

1   does it require that Demos willfully has acted to harm

2   Cantor.  Demos admittedly lied to customers,

3   regardless of whether he intended to induce them to

4   trade based on his misrepresentations.  All that is

5   required is the act itself and the MGP's good faith

6   determination that the act did or could reasonably be

7   expected to harm Cantor.

8              Second, Demos looks to his acquittal

9   of all criminal charges and the SEC's decision not to

10  pursue any enforcement action against him to highlight

11  the government's failure to prove his intent and the

12  materiality of his misrepresentations.  Again, intent

13  is irrelevant under the Agreement.  So is the

14  materiality of his representations, where the MGP has

15  in good faith determined that they harmed Cantor.

16  Acquittal is not grounds to upend the MGP's

17  determination that Demos' actions harmed or reasonably

18  could be expected to harm Cantor.  And, more

19  generally, under the plain language of Sections 3.05

20  and 9.05, Demos' acquittal does not matter.  The

21  Agreement does not require conviction to preclude

22  indemnification, even though criminal acts can be the

23  basis for preclusion.

24              Third, Demos contends that Cantor

28

1    profited from his misconduct.  Cantor's profit from

2    Demos' trades is irrelevant when considering the

3    overall impact of his misconduct.  Under Sections 3.05

4    and 9.05, regardless of short-term profitability, the

5    trades were reasonably likely to harm Cantor in that

6    they resulted in subsequent settlements, regulatory

7    costs, and reputational harm.  A mere allegation of

8    profit on the trades does not create a triable issue

9    of material fact with respect to the MGP's good faith

10   determination of harm to Cantor.

11              Fourth, Demos asserts that Cantor

12   failed to flag or provide notice of his wrongdoing

13   when they likely had the opportunity to discover it.

14   In support, Demos contends that his actions are common

15   in the industry, that his deal activity was under

16   constant surveillance and compliance review but never

17   sanctioned, and that Cantor issued a companywide

18   memorandum proscribing the conduct for the first time

19   over two years after Demos' resignation.

20              As with other proffered issues,

21   whether or not Cantor contemporaneously knew of Demos'

22   wrongdoing and provided him with notice of it is

23   irrelevant under Sections 3.05 and 9.05.  That

24   supervisors might have discovered misconduct or that

29

1    other broker-dealers in the industry lied to customers

2    does not negate the MGP's determination.  Even if

3    Demos' supervisors were aware of his and other

4    traders' misbehavior at the time, that does not

5    foreclose a later finding by the MGP that Demos'

6    actions harmed Cantor.  Demos has offered no evidence

7    to support that Cantor actually viewed or pieced

8    together the surveillance of his actions, and has

9    failed to articulate how supervisory knowledge of his

10   actions would evidence a bad faith determination by

11   the MGP.  Demos has acknowledged the impact of his

12   lies, and that alone is sufficient to support the

13   MGP's decision that his actions harmed Cantor.

14              On these miscellaneous and irrelevant

15   issues, I also decline to permanent Demos to pursue

16   discovery to develop alleged issues of material fact.

17              The record submitted supports the

18   conclusion that the MGP's determination under

19   Sections 3.05 and 9.05 were made in good faith as a

20   matter of law.  Demos has failed to successfully argue

21   otherwise, and a more developed record would be of no

22   benefit in the face of Cantor's demonstration that the

23   MGP acted in good faith.  Because the MGP acted in

24   good faith, Demos' indemnification is precluded.

30

1    Because I conclude that Demos' indemnification request

2    is barred under Section 9.05 of the Agreement, I grant

3    summary judgment in Cantor's favor on Count I of the

4    amended complaint, as well as Counts I and III of

5    Demos' counterclaim.

6              Cantor is also entitled to summary

7    judgment on Count II of defendant's counterclaim for

8    promissory estoppel.  Demos alleges that Cantor made a

9    clear and unambiguous promise to indemnify him and

10   that he reasonably relied on that promise.  Promissory

11   estoppel "is inapplicable where there is an existing

12   contract that governs the issue before the Court."

13   That's a quote from *Hiller versus Arban, LLC*.  Because

14   Demos' claim to indemnification is governed by

15   Section 9.05 of the Agreement, his claim for

16   promissory estoppel fails.  The Agreement is an

17   enforceable contract, and there is no dispute that

18   Section 9.05 governs whether former limited partners

19   such as Demos are entitled to demonstration.  Further,

20   Demos fails to respond to Cantor's argument in favor

21   of dismissal or to otherwise support his promissory

22   estoppel claim.  Cantor is entitled to summary

23   judgment on Count II of Demos' counterclaim.

24              Finally, I conclude that Cantor is

31

1   entitled to summary judgment on Count IV of Demos'
2   counterclaim, which asserts a breach of the implied
3   covenant of good faith and fair dealing.  The implied
4   covenant of good faith and fair dealing inheres in
5   every contract.  The implied covenant involves a
6   cautious enterprise, inferring contractual terms to
7   handle developments or contractual gaps that the
8   asserting party pleads neither party anticipated.  The
9   doctrine cannot be used to circumvent the parties'
10  bargain, or to create a free-floating duty unattached
11  to the underlying legal documents.

12              "We will only apply contract terms
13  when the party asserting the implied covenant proves
14  that the other party has acted arbitrarily or
15  unreasonably, thereby frustrating the fruits of the
16  bargain that the asserting party reasonably expected.
17  When conducting this analysis, we must assess the
18  parties' reasonable expectations at the time of
19  contracting and not rewrite the contract to appease a
20  party who later wishes to rewrite a contract he now
21  believes to have been a bad deal.  Parties have a
22  right to enter into good and bad contracts, the law
23  enforces both."  And that is a quote from *Nemec versus*
24  *Shrader*.

32

1                    Determining whether the implied

2     covenant applies turns on the language of the contract

3     itself.  The claim for breach of the implied covenant

4     cannot be based on conduct authorized by terms of the

5     agreement, and the implied covenant cannot be invoked

6     where the contract itself expressly covers the subject

7     at issue.  The Court relies on the implied covenant

8     only in that narrow band of cases where the contract

9     as a whole speaks sufficiently to suggest an

10    obligation and point to a result, but does not speak

11    directly enough to provide an explicit answer.

12                    Demos alleges that Cantor's decision

13    to deny indemnification was malicious, unreasonable,

14    or arbitrary and that the denial frustrated the fruits

15    of the parties' bargain.  Cantor contends that the

16    claim fails as a matter of law because Demos has

17    failed to identify any gap in Section 9.05 of the

18    Agreement that the Court must fill.  Demos does not

19    respond to Cantor's argument that he's failed to

20    identify a gap to be filled by the implied covenant.

21    Rather, he asserts that there is a genuine dispute as

22    to whether Cantor arbitrarily denied his

23    indemnification.

24                    First, Demos asserts that Cantor did

33

1   not provide him with notice that his actions could

2   reasonably be expected to harm the Partnership.  By

3   their plain terms, neither Section 3.05 nor 9.05

4   entitles Demos to such notice.  Demos may not invoke

5   the implied covenant to write in a duty he wishes

6   Cantor had.

7             Second, Demos contends that Cantor

8   acted arbitrarily and in bad faith by withholding

9   indemnification to "curry favor with federal

10  prosecutors," as explained previously.  Satisfying the

11  implied covenant of good faith and fair dealing does

12  not necessarily require that the party have acted in

13  subjective good faith.  And the definition of good

14  faith in the Agreement does not displace the implied

15  covenant.  But in any certain circumstances, "the

16  determination that the explicit contractual provision

17  involved was not breached precludes a finding of an

18  implied covenant dealing with the same subject."

19  That's a quote from *Shenandoah Life Insurance*.

20            As discussed, Demos' pretext argument

21  fails in view of the evidentiary record.  Cantor did

22  not breach Section 3.05 or 9.05 by denying Demos'

23  request.  Rather, as permitted by the plain terms of

24  the Agreement, the MGP determined in good faith that

34

1  Demos' actions could reasonably be expected to harm

2  the Partnership and therefore consisted of a material

3  breach of the Agreement that precludes

4  indemnification.  The MGP made its decision just as

5  the Agreement said that it must.  The MGP did not make

6  that decision arbitrarily.

7             Because the Agreement expressly covers

8  the issue of indemnification and because Demos is

9  unable to identify any gaps in the Agreement, Demos'

10  claims under the implied covenant of good faith and

11  fair dealing fails.

12             In conclusion, summary judgment is

13  entered in Cantor's favor on all counts of Demos'

14  complaint and counterclaim.  I ask that the parties

15  submit an implementing order within five days of this

16  ruling.

17             Mr. Beck, is anything unclear, or do

18  you have any questions?

19             (No response)

20             THE COURT:  Mr. Beck, are you on mute?

21             MR. BECK:  Sorry.  Yes, I am.  Sorry.

22  Yes, I was.

23             THE COURT:  No problem.

24             MR. BECK:  No, I don't have any

35

1    questions, Your Honor, except is Your Honor going to

2    be filing your opinion, or were you relying on the

3    transcript?

4                    THE COURT:  No.  I'm relying on the

5    transcript.  And, again, I appreciate your forbearance

6    with that in these strange times.

7                    MR. BECK:  Yeah, okay.  Thank you.

8                    THE COURT:  Thank you.

9                    MR. BECK:  I don't have -- I'll ask my

10   cocounsel if she has any questions, also.

11                   THE COURT:  Ms. Williams?

12                   MS. WILLIAMS:  Yes.  No questions

13   here.  Thank you.

14                   THE COURT:  Thank you.

15                   Mr. Loughman, anything unclear on your

16   end?

17                   MR. LOUGHMAN:  Not from us, Your

18   Honor.  Thank you very much.

19                   THE COURT:  All right.  Thank you all

20   very much.  Be well and take care.  Bye.

21                   COUNSEL:  Thank you, Your Honor.

22                   (Court adjourned at 11:41 a.m.)

23                            - - -

24

36

1                              CERTIFICATE

2

3                    I, NEITH D. ECKER, Chief Realtime

4    Court Reporter for the Court of Chancery of the State

5    of Delaware, Registered Diplomate Reporter, Certified

6    Realtime Reporter, do hereby certify that the

7    foregoing pages numbered 3 through 35 contain a true

8    and correct transcription of the rulings as

9    stenographically reported by me at the hearing in the

10   above cause before the Vice Chancellor of the State of

11   Delaware, on the date therein indicated, which were

12   revised by the Vice Chancellor.

13                        IN WITNESS WHEREOF I have hereunto set

14   my hand at Wilmington, this 1st day of May 2020.

15

16

17

18                              /s/ Neith D. Ecker
                         ----------------------------------
19                        Chief Realtime Court Reporter
                          Registered Diplomate Reporter
20                         Certified Realtime Reporter

21

22

23

24

CHANCERY COURT REPORTERS